**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **COLUMBIA MEDICAL CENTER OF** | § | |
| **PLANO SUBSIDIARY, L.P. D/B/A** | § | |
| **MEDICAL CITY PLANO AND D/B/A** | § | |
| **MEDICAL CITY FRISCO,** | § | |
| **A MEDICAL CENTER OF PLANO** | § | |
| **FACILITY; COLUMBIA HOSPITAL AT** | § | |
| **MEDICAL CITY DALLAS** | § | |
| **SUBSIDIARY, L.P. D/B/A MEDICAL** | § | |
| **CITY DALLAS; COLUMBIA NORTH** | § | |
| **HILLS HOSPITAL SUBSIDIARY, L.P.** | § | **Case No. _____** |
| **D/B/A MEDICAL CITY NORTH HILLS;** | § | |
| **COLUMBIA MEDICAL CENTER OF** | § | |
| **LAS COLINAS, INC. D/B/A MEDICAL CITY** | § | |
| **LAS COLINAS; COLUMBIA MEDICAL** | § | |
| **CENTER OF DENTON SUBSIDIARY, L.P.** | § | |
| **D/B/A MEDICAL CITY DENTON;** | § | |
| **EL PASO HEALTHCARE SYSTEM, LTD.** | § | |
| **D/B/A LAS PALMAS MEDICAL CENTER** | § | |
| **AND D/B/A DEL SOL MEDICAL** | § | |
| **CENTER; ST. DAVID'S HEALTHCARE** | § | |
| **PARTNERSHIP, L.P., LLP D/B/A** | § | |
| **ST. DAVID'S MEDICAL CENTER,** | § | |
| **D/B/A ST. DAVID'S NORTH AUSTIN** | § | |
| **MEDICAL CENTER, D/B/A ST. DAVID'S** | § | |
| **SOUTH AUSTIN MEDICAL CENTER,** | § | |
| **D/B/A ST. DAVID'S** | § | |
| **GEORGETOWN HOSPITAL, AND D/B/A** | § | |
| **HEART HOSPITAL OF AUSTIN;** | § | |
| **KPH-CONSOLIDATION, INC. D/B/A** | § | |
| **HCA HOUSTON HEALTHCARE** | § | |
| **KINGWOOD; CHCA CONROE, L.P.** | § | |
| **D/B/A HCA HOUSTON HEALTHCARE** | § | |
| **CONROE; ORTHOPEDIC HOSPITAL,** | § | |
| **LTD. D/B/A TEXAS ORTHOPEDIC** | § | |
| **HOSPITAL; BAY AREA HEALTHCARE** | § | |
| **GROUP, LTD. D/B/A CORPUS CHRISTI** | § | |
| **MEDICAL CENTER; COLUMBIA RIO** | § | |
| **GRANDE HEALTHCARE, L.P. D/B/A** | § | |
| **RIO GRANDE REGIONAL HOSPITAL** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                    **Page 1**

| | |
|---|---|
| **Plaintiffs,** | § |
| | § |
| **v.** | § |
| | § |
| **HIGHMARK INC. D/B/A HIGHMARK** | § |
| **BLUE CROSS BLUE SHIELD;** | § |
| **AND HIGHMARK WESTERN AND** | § |
| **NORTHEASTERN NEW YORK INC.** | § |
| **D/B/A BLUECROSS BLUESHIELD OF** | § |
| **WESTERN NEW YORK AND BLUESHIELD** | § |
| **OF NORTHEASTERN NEW YORK** | § |
| | § |
| **Defendants.** | § |

## PLAINTIFFS' ORIGINAL COMPLAINT

NOW COMES, Plaintiffs, Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano and d/b/ Medical City Frisco, a Medical Center of Plano Facility; Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas; Columbia North Hills Hospital Subsidiary, L.P. d/b/a Medical City North Hills; Columbia Medical Center of Las Colinas, Inc. d/b/a Medical City Las Colinas; Columbia Medical Center of Denton Subsidiary, L.P. d/b/a Medical City Denton; El Paso Healthcare System, Ltd. d/b/a Las Palmas Medical Center and d/b/a Del Sol Medical Center; St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Medical Center, d/b/a St. David's North Austin Medical Center, d/b/a St. David's South Austin Medical Center, d/b/a St. David's Georgetown Hospital, and d/b/a Heart Hospital of Austin; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood; CHCA Conroe, L.P. d/b/a HCA Houston Healthcare Conroe; Orthopedic Hospital, Ltd. d/b/a Texas Orthopedic Hospital; Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center; Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital (collectively, "Plaintiffs"), by and through their attorneys, Polsinelli PC, and complain of Defendants Highmark Inc. d/b/a Highmark Blue Cross Blue Shield; and Highmark Western and Northeastern New York Inc. d/b/a BlueCross BlueShield of Western

**PLAINTIFFS' ORIGINAL COMPLAINT**                                        **Page 2**

New York and BlueShield of Northeastern New York (collectively, "Defendants") as follows:

### A. PARTIES

1.      Plaintiff, Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano and d/b/a Medical City Frisco, a Medical Center of Plano Facility ("MC Plano"), is a Texas limited partnership with its principal place of business in Collin County, Texas. MC Plano is a citizen of the State of Texas. MC Plano has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with its principal place of business in Nashville, Tennessee (its general partner) and Medical Center of Plano Partner, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee (its limited partner). By and through its partners, MC Plano is a citizen of the States of Texas, Tennessee, and Delaware.

2.      Plaintiff, Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas ("MC Dallas"), is a Texas limited partnership with its principal place of business in Dallas County, Texas. MC Dallas is a citizen of the State of Texas. MC Dallas has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with its principal place of business in Nashville, Tennessee (its general partner) and Medical City Dallas Partner, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee (its limited partner). By and through its partners, MC Dallas is a citizen of the States of Texas, Tennessee, and Delaware.

3.      Plaintiff, Columbia North Hills Hospital Subsidiary, L.P. d/b/a Medical City North Hills ("MC North Hills"), is a Texas limited partnership with its principal place of business in Tarrant County, Texas. MC North Hills has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with its principal place of business in Nashville, Tennessee

(its general partner) and Columbia North Texas Healthcare System, L.P., a Texas limited partnership with its principal place of business in Nashville, Tennessee (its limited partner). Columbia North Texas Healthcare System, L.P. has two partners: GalTex, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee, and NTGP, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee. By and through its partners, MC North Hills is a citizen of the States of Texas, Tennessee, and Delaware.

4.    Plaintiff, Columbia Medical Center of Las Colinas, Inc. d/b/a Medical City Las Colinas ("MC Las Colinas"), is a Texas for-profit corporation with its principal place of business in Dallas County, Texas. MC Las Colinas is a citizen of the State of Texas.

5.    Plaintiff, Columbia Medical Center of Denton Subsidiary, L.P. d/b/a Medical City Denton ("MC Denton"), is a Texas limited partnership with its principal place of business in Denton County, Texas. MC Denton has two partners: Columbia North Texas Subsidiary GP, LLC, a Texas limited liability company with its principal place of business in Nashville, Tennessee (its general partner) and Columbia North Texas Healthcare System, L.P., a Texas limited partnership with its principal place of business in Nashville, Tennessee (its limited partner). Columbia North Texas Healthcare System, L.P. has two partners: GalTex, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee, and NTGP, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee. By and through its partners, MC Denton is a citizen of the States of Texas, Tennessee, and Delaware.

6.    Plaintiff, El Paso Healthcare System, Ltd. d/b/a Las Palmas Medical Center ("Las Palmas MC") and d/b/a Del Sol Medical Center ("Del Sol MC") (collectively, "El Paso HS") is a Texas limited partnership with its principal place of business in El Paso County, Texas. El Paso

**PLAINTIFFS' ORIGINAL COMPLAINT**                                        **Page 4**

HS's partner is Sun Towers/Vista Holdings Co., a Texas for-profit corporation with a principal place of business in Nashville, Tennessee. By and through its partners, El Paso HS is a citizen of the States of Texas and Tennessee.

7.    Plaintiff, St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Medical Center ("St. David's MC"), d/b/a St. David's North Austin Medical Center ("North Austin MC"), d/b/a St. David's South Austin Medical Center ("South Austin MC"), d/b/a St. David's Georgetown Hospital ("Georgetown Hospital") and d/b/a Heart Hospital of Austin  ("Heart Hospital") (collectively, "St. David's") is a Texas limited partnership with its principal place of business in Travis County, Texas. St. David's has five partners: Round Rock Hospital, Inc. (its co-general partner), a Delaware for-profit corporation with its principal place of business in Nashville, Tennessee; Columbia-SDH Holdings, Inc., a Delaware for-profit corporation with its principal place of business in Nashville, Tennessee; COL-NAMC Holdings, Inc., a Texas for-profit corporation with its principal place of business in Nashville, Tennessee; St. David's Foundation (its co-general partner), a Texas nonprofit corporation with its principal place of business in Austin, Texas; and Georgetown Healthcare System, Inc., a Texas nonprofit corporation with its principal place of business in Georgetown, Texas. By and through its partners, St. David's is a citizen of the States of Texas, Tennessee, and Delaware.

8.    Plaintiff, KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood ("Kingwood") is a Texas for-profit corporation with its principal place of business in Harris County, Texas. Kingwood is a citizen of the State of Texas.

9.    Plaintiff, CHCA Conroe, L.P. d/b/a HCA Houston Healthcare Conroe ("Conroe") is a Delaware limited partnership with its principal place of business in Montgomery County, Texas. Conroe has two partners: Conroe Hospital Corporation, a Texas for-profit corporation with

a principal place of business in Nashville, Tennessee (its general partner) and Conroe Partner, LLC, a Delaware limited liability company with its principal place of business in Nashville, Tennessee (its limited partner). By and through its partners, Conroe is a citizen of the States of Texas, Tennessee, and Delaware.

10. Plaintiff, Orthopedic Hospital, Ltd. d/b/a Texas Orthopedic Hospital ("TOH") is a Texas limited partnership with its principal place of business in Harris County, Texas. TOH has two partners: Columbia Hospital Corporation at the Medical Center, a Texas for-profit corporation with its principal place of business in Nashville, Tennessee (its general partner) and Columbia/HCA of Houston, Inc., a Texas for-profit corporation with its principal place of business in Nashville, Tennessee (its limited partner). By and through its partners, TOH is a citizen of the States of Texas and Tennessee.

11. Plaintiff, Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center ("CCMC") is a Texas limited partnership with its principal place of business in Nueces County, Texas. CCMC has two general partners: Columbia Hospital Corporation of Bay Area, a Texas for profit corporation with its principal place of business in Nashville, Tennessee, and South Texas Surgicare, Inc., a Texas for profit corporation with its principal place of business in Nashville, Tennessee. CCMC has three limited partners: CHC Holdings, Inc., a Texas for-profit corporation with its principal place of business in Montgomery County, Texas; Riverside Hospital, Inc., a Delaware for-profit corporation with its principal place of business in Nashville, Tennessee; and Women's Hospital Indianapolis, L.P., a Delaware limited partnership with its principal place of business in Nashville, Tennessee, and whose general partner is Women's Hospital Indianapolis GP, Inc., a Delaware for-profit corporation with its principal place of business in Dallas, Texas. By and through its partners, CCMC is a citizen of the States of Texas, Tennessee, and Delaware.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                                                                **Page 6**

12.     Plaintiff, Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital ("Rio Grande") is a Delaware limited partnership with its principal place of business in Hidalgo County, Texas. Rio Grande has two partners: Rio Grande Regional Hospital, Inc., a Texas for-profit corporation with its principal place of business in Nashville, Tennessee, and HCA Health Services of Texas, Inc., a Texas for-profit corporation with its principal place of business in Nashville, Tennessee. By and through its partners, Rio Grande is a citizen of the States of Delaware, Texas, and Tennessee.

13.     Defendant, Highmark Inc. d/b/a Highmark Blue Cross Blue Shield ("Highmark PA"), is a corporation organized under the laws of the Commonwealth of Pennsylvania, doing business in Texas. Highmark PA is a citizen of the Commonwealth of Pennsylvania. Highmark PA does not maintain a regular place of business in Texas and does not have a designated agent for service of process. This lawsuit arises from Highmark PA's business in Texas, and it may, therefore, be served through the Texas Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044(b). Highmark PA's principal place of business is located at 1800 Center St., Camp Hill, Cumberland County, Pennsylvania 17011. Highmark PA is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield branded health plans in the Commonwealth of Pennsylvania. As explained below, Highmark PA's Subscribers (defined below) are not confined to the Commonwealth of Pennsylvania, and routinely receive hospital services in other states, including Texas, for which Highmark PA is financially responsible.

14.     Defendant, Highmark Western and Northeastern New York Inc. d/b/a BlueCross BlueShield of Western New York and BlueShield of Northeastern New York ("Highmark NY"), is a for-profit corporation organized under the laws of the State of New York, doing business in Texas. Highmark NY is a citizen of the State of New York. Highmark NY does not maintain a

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 7**

regular place of business in Texas and does not have a designated agent for service of process. This lawsuit arises from Highmark NY's business in Texas, and it may, therefore, be served through the Texas Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044(b). Highmark NY's principal place of business is located at 1 Seneca St. Floor 34, Buffalo, New York 14203. Highmark NY is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield branded health plans in the State of New York. As explained and defined below, Highmark NY's Subscribers are not confined to the State of New York and routinely receive hospital services in other states, including Texas, for which Highmark NY is responsible.

## B. JURISDICTION AND VENUE

15.    This Court has personal jurisdiction over the Defendants because they conduct substantial business in Texas, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here. Further, Defendants are affiliates of Blue Cross and Blue Shield of Texas ("BCBSTX") as defined in the Agreements.[1] Part III(H) of the Agreements specifically allows affiliates of BCBSTX access to the benefits of the Agreements (namely, in-network reimbursement rates, which provide a discount off of Plaintiffs' billed charges), provided the affiliates comply with all terms and provisions of the Agreements. As such, by accessing the benefits of the Agreements, Defendants agreed to comply with their terms, including the requirement that the Agreements be governed by Texas law. Defendants insure and/or administer health plans that cover Texas residents. Upon information and belief, the Subscriber patients at issue in this matter reside in the State of Texas. All of the Subscriber patients at issue in this matter received medical services in the State of Texas. Defendants issued and/or administered these health

---

[1] The term "Agreements" is defined in Paragraph 19 below.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 8**

plans to/for Texas residents, knowing the possibility of Subscriber patients receiving medical services in Texas and of Defendants having to resolve disputes under the Agreements based on Texas law. Defendants therefore have sufficient contacts with the State of Texas and do business in the State of Texas for purposes of personal jurisdiction, and it is reasonably foreseeable that they would be haled into a Texas court for their actions in connection with insuring and administering health plans that cover Texas residents. Additionally, this Court has personal jurisdiction because the Employee Retirement Income Security Act of 1974 ("ERISA") provides for nationwide service of process, and Defendants have sufficient minimum contacts with the United States, as they do business in and are citizens of the United States. *See* 29 U.S.C. § 1132(e)(2).

16.     This Court has subject matter jurisdiction because this dispute is between citizens of different states (Plaintiffs are citizens of the States of Texas, Tennessee, and Delaware, and Defendants are citizens of the Commonwealth of Pennsylvania and the State of New York), and the amount in controversy is greater than $75,000. Further, this Court has original subject matter jurisdiction under federal question jurisdiction pursuant to 28 U.S.C. § 1331 because ERISA is a federal statute that arises under the laws of the United States. Further, this Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, as described below. Specifically, the healthcare claims and appeals of such claims were provided to BCBSTX for initial processing and then subsequently forwarded by BCBSTX to Defendants for final adjudication, as described in additional detail below. BCBSTX is headquartered in the Northern District of Texas. As such, BCBSTX partially

processed these claims and provided notices of their adjudication on behalf of Defendants in the Northern District of Texas, thus making venue proper under 28 U.S.C. § 1391(b)(2). Venue is also proper under 29 U.S.C. § 1132(e)(2) because Plaintiffs have asserted a claim under ERISA, and the administration of these health plans, for purposes of the claims at issue, took place at least in part at BCBSTX, which is located in the Northern District of Texas. Further, at least some portion of the breach of the health plans at issue also took place in this judicial district, as Defendants denied reimbursement for medical services rendered in the Northern District of Texas.

## C. FACTUAL BACKGROUND

### I. THE BLUECARD PROGRAM

18.     Plaintiffs are acute care hospitals throughout Texas. Plaintiffs provide medically necessary hospital services to their local communities.

19.     As part of their provision of medically necessary services to their local communities, Plaintiffs contracted with non-party BCBSTX through several agreements. Specifically:

    a)  Plaintiffs MC Plano, MC Dallas, MC Denton, MC North Hills, and MC Las Colinas contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016) (as amended, the "North Texas Agreement");

    b)  Plaintiffs Las Palmas MC and Del Sol MC contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016) (as amended, the "El Paso Agreement");

    c)  Plaintiffs Conroe, Kingwood, TOH, CCMC, and Rio Grande contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation

(eff. Nov. 1, 2016) (as amended, the "Gulf Coast Agreement");

    d)  Plaintiffs St. David's MC, North Austin MC, South Austin MC, Georgetown Hospital, and Heart Hospital contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016) (as amended, the "St. David's Agreement");

(collectively, the "Agreements"). The Agreements specify the terms and conditions under which Plaintiffs will treat patients with Blue Cross and Blue Shield ("BCBS") health plans (referred to in the Agreements, and subsequently herein, as "Subscribers") and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to be paid at specified rates for the provision of medically necessary, covered services to a Subscriber.

    20.    The Agreements are far broader than the relationship between just Plaintiffs, BCBSTX, and Subscribers enrolled in a BCBSTX health plan, however. The Agreements apply to the treatment that Plaintiffs provide to any Subscribers enrolled in a BCBS health plan, including Subscribers who have BCBS health plans through another state's Blue Cross and/or Blue Shield licensee, like Defendants. Highmark PA and Highmark NY are the Blue Cross and/or Blue Shield licensees for the Commonwealth of Pennsylvania and the State of New York, respectively. Thus, the Agreements apply to the treatment that Plaintiffs provided to Defendants' Subscribers.

    21.    When Plaintiffs treat a Subscriber who has a BCBS-branded health plan administered or underwritten by a Blue Cross and/or Blue Shield licensee other than BCBSTX, the Agreements still govern Plaintiffs' provision of and reimbursement for that treatment. Plaintiffs' request for payment (referred to as a "claim") is handled through a system known as the "BlueCard Program."

    22.    Under the BlueCard Program, Plaintiffs submit their claims to BCBSTX (the

"local" or "Host Plan") for the services they provided to a Subscriber. BCBSTX then reviews the claim, determines the amount that would be payable under the Agreements for the services that Plaintiffs provided to the Subscriber(s), and forwards the claim to the BCBS health plan that insures the Subscriber or administers the Subscriber's health plan (referred to as the "Home Plan"). The Home Plan then applies the Subscriber's health benefits, makes coverage determinations, and either approves or denies payment for the services. BCBSTX then transmits the Home Plan's decision and payment to Plaintiffs. Importantly, the payment rates specified in the Agreements between BCBSTX and Plaintiffs govern the amount Plaintiffs are entitled to be reimbursed for the services provided to the Subscriber, regardless of whether that Subscriber is a participant in a BCBSTX health plan or another state's BCBS health plan. The Home Plan accesses and relies upon the rates specified in the Agreements when making payment.

23.    In the present case, the Defendants are the Home Plans for the Subscribers. Plaintiffs rendered services to the Subscribers and submitted their claims for such services to BCBSTX for forwarding to Defendants through the BlueCard Program. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Defendants to reimburse them for the services provided to Defendants' Subscribers at the rates specified in the Agreements. Further, Plaintiffs' expectations of reimbursement by Defendants at the rates specified in the Agreements were reinforced by Defendants' own conduct and representations.

24.    Defendants, upon information and belief, represent on their website that Plaintiffs are "in-network" with Defendants through the BlueCard Program. Specifically, Highmark PA includes a page on its website called "BlueCard Information Center."[2] The BlueCard Information

---

[2] *See BlueCard Information Center*, Highmark (last updated Oct. 11, 2022), https://providers.highmark.com/provider-network/inter-plan-programs/bluecard-information-center.html#priorauthorization.  A printout of the BlueCard Information Center is also attached hereto as Exhibit 1.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                                          **Page 12**

Center displays a link entitled "BlueCard Hospital and Doctor Finder," which directs Subscribers to an online directory maintained by BCBS where Subscribers can search for "doctors and health care professionals across the country."[3]  The directory reflects that each of the Subscribers at issue were "in-network" with the Plaintiff facility at which he or she sought treatment.[4]  The reference to "in-network" signifies that such providers are contracted providers that will provide services at the discounted rates in the Agreements as opposed to full-billed charges for services.[5]

26.      Defendants also provide informational and marketing materials on their website that explain how the BlueCard program operates, including that the Home Plan is responsible for adjudicating claims and reimbursing the local BCBS plan for claims processed through the local plan (a/k/a Host Plan) under the BlueCard Program. The BlueCard Information Center advertises, "The BlueCard Program allows participating Blue Plan providers in every state to submit claims to their local Blue Plan for indemnity, PPO, and managed care patients who are enrolled in an out-of-area Blue Plan."[6]

26.      The BlueCard Information Center also displays a link to a "Frequently Asked Questions Page."[7]  The Frequently Asked Questions Page explains, "BlueCard is a national program that enables members of one Blue Plan to obtain healthcare service benefits while traveling or living in another Blue Plan's service area. The program links participating healthcare

---

[3] *See Find a Doctor Near You*, BlueCross BlueShield (last visited Mar. 3, 2025), https://www.bcbs.com/member-services/find-a-doctor.  A printout of the online directory webpage is attached hereto as Exhibit 2.

[4] Samples of online directory search results showing Plaintiffs as "in-network" for the Subscriber patients are attached hereto as Collective Exhibit 3.

[5] *See e.g., Molina Healthcare of Texas, Inc. v. ACS Primary Care Physicians S.W., PA*, No. 01-21-00727-CV, 2024 WL 3608192, at *13 (Tex. App. – Hous. [1st Dist.] Aug. 1, 2024) (explaining that when a provider is "in-network" with an insurer, it brings certainty to the provider's relationship with the insurer because the provider is entitled to payment at the negotiated rates set forth in its contract with the insurer).

[6] *See* Exhibit 1.

[7] *See* Exhibit 1.

**PLAINTIFFS' ORIGINAL COMPLAINT**                              **Page 13**

providers with the independent Blue Cross and Blue Shield Plans across the country, and in more than 200 countries and territories worldwide, through a single electronic network for claims processing and reimbursement."[8] The Frequently Asked Questions Page further explains that, under the BlueCard Program, the local BCBS plan — here, BCBSTX — is responsible for "pricing claims and applying pricing and reimbursement rules consistent with provider contractual agreements."[9]  The applicable "agreements" in this case are the Agreements referenced above.

27.    Additionally, in a provider manual published on Defendants' website (the "Provider Manual"), Defendants explain how the BlueCard program operates in practice to educate the providers in their local service area who may encounter Subscribers of an out-of-state BCBS plan. Defendants explain the BlueCard Program as involving "network reciprocity," which includes the application of "locally negotiated rates" to claims for services provided to Subscribers of out-of-state BCBS plans.[10]  Defendants' Provider Manual also includes illustrations of how the BlueCard Program operates, which demonstrate that when a Home Plan's Subscriber receives covered services in another state, the Home Plan "adjudicates the claim according to the member's benefits and the provider's arrangement with the [local BCBS plan]."[11]

28.    This dispute involves Plaintiffs' provision of medically necessary hospital services to 27 of Defendants' Subscribers in the State of Texas that are payable under the Agreements and

---

[8] *See BlueCard Program: Answers to Frequently Asked Questions*, Highmark (last visited Mar. 3, 2025), https://providers.highmark.com/content/dam/highmark/en/providerresourcecenter/pdfs/all/docume nts/pdfs/provider-network/inter-plan-programs/bluecard-faqs.pdf. A printout of the Frequently Asked Questions Page is attached hereto as Exhibit 4.

[9] *See* Exhibit 4.

[10] *See Highmark Provider Manual: Chapter 2 – Product Information, Unit 6: The BlueCard Program*, Highmark (last visited Mar. 3, 2025), https://providers.highmark.com/resources-and-education/highmark-provider-manual/chapter-2-product-information/unit-6-the-bluecard-program.html.  A copy of the provider manual is attached hereto as Exhibit 5.

[11] *See* Exhibit 5.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                          **Page 14**

for which Defendants have improperly refused to pay Plaintiffs. Each of the 27 Subscribers received medically necessary services from Plaintiffs under the BlueCard Program, and Defendants are obligated to approve coverage for those services under each Subscriber's respective health plan and issue payment to Plaintiffs under the Agreements for such covered services.

## II. Facts Concerning The Claims at Issue[12]

29.     <u>Patient 1, Admitted and Discharged in 2021</u>: At the time the services were rendered, Patient 1 was a 31-year-old female who presented to Kingwood's emergency department with acute symptomatic cholecystitis. She was placed on antibiotics and fluids and admitted as an inpatient the following day per physician order. Imaging confirmed that Patient 1 had an abnormally dilated gallbladder with gallbladder wall thickening and pericholecystic, which was indicative of acute cholecystitis.

30.     On the first day of Patient 1's admission, she was evaluated for potential surgical intervention. The next day, Patient 1 underwent a laparoscopic to converted open cholecystectomy with biliary stenting and then was discharged two days later.

31.     Patient 1 presented at Kingwood with coverage under a Highmark PA health plan. During Patient 1's inpatient admission, Kingwood sent Patient 1's clinicals and medical records to Highmark PA and requested authorization for treatment.

32.     Via correspondence dated December 11, 2021, Highmark PA informed Kingwood that the inpatient admission was not approved because it allegedly did not satisfy criteria for medical necessity, and the services could have purportedly been provided in a setting of lower

---

[12] All patients have been deidentified in the Complaint pursuant to The Health Insurance Portability and Accountability Act (HIPAA) of 1996; however, information identifying these patients and the claims associated with their care at Plaintiffs' facilities has been previously provided to Defendants.

acuity.

33.     On December 18, 2021, Kingwood timely submitted a claim for the services provided to Patient 1 to BCBSTX for forwarding to Highmark PA. Subsequently, via correspondence dated December 20, 2021, BCBSTX, on behalf of Highmark PA, requested Patient 1's medical records to facilitate processing the claim. On January 7, 2022, Patient 1's medical records were provided to BCBSTX for forwarding to Highmark PA.

34.     Via correspondence dated February 8, 2022, BCBSTX, on behalf of Highmark PA, stated that one of the billing codes used in connection with the claim was not supported by the medical records that were provided by Kingwood. Via remittance dated February 24, 2022, Kingwood was informed that Highmark PA denied the claim on the basis that the services provided to Patient 1 were not medically necessary because they allegedly could have been provided in a setting of lower acuity.

35.     On March 16, 2022, Kingwood timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 1's medical records, and requested a medical necessity review.

36.     Via correspondence dated March 29, 2022, BCBSTX, on behalf of Highmark PA, acknowledged that it had received the appeal for review, which was to be completed within 30 days. On April 6, 2022, Kingwood spoke to a BCBSTX representative who confirmed that Highmark PA had received the appeal, that the appeal was currently under review, and that the review should be concluded within 30 to 60 days. On April 13, 2022, Kingwood spoke to a BCBSTX representative who stated that Highmark PA had upheld the denial on April 7, 2022 on the basis that the services were not medically necessary.

37.     On May 10, 2022, Kingwood timely submitted its second-level appeal to BCBSTX

for forwarding to Highmark PA, enclosed a copy of Patient 1's medical records, and requested a medical necessity review.

38.    On May 31, 2022, Kingwood spoke to a BCBSTX representative who confirmed that Highmark PA had received the appeal, that the appeal was currently under review, and that the review should be concluded within 30 to 60 days. Via correspondence dated May 31, 2022, Highmark PA denied Kingwood's second-level appeal on the basis that the services were not medically necessary.

39.    The denial of Kingwood's claim for services rendered to Patient 1 as not medically necessary constituted a wrongful denial of benefits and should be reversed.

40.    First, the services provided to Patient 1, as shown by the medical records submitted to Highmark PA, were medically necessary and at the appropriate level of acuity. The fact that InterQual[13] criteria was met corroborates the medical necessity of the inpatient admission that was ordered by Patient 1's physician in the exercise of their professional medical judgment.  The fact that Patient 1 underwent an open cholecystectomy, which is listed on the CMS Inpatient Only List (Addendum E),[14] further corroborates the medical necessity of the inpatient admission.

41.    In sum, Kingwood provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement,

---

[13] InterQual criteria are guidelines used by health plans and healthcare providers as a tool to evaluate the appropriate level of care (inpatient, observation, or outpatient) for hospitalized patients. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

[14] The CMS Inpatient Only List is a list of medical procedures that the Centers for Medicare & Medicaid Services ("CMS") will only cover if they are performed in an inpatient hospital setting. The Inpatient Only List ensures that complex or high-risk procedures are performed in a safe and monitored environment and prevents these procedures from being performed in outpatient settings, such as surgery centers or doctor's offices where medically necessary support may not be available. While the Inpatient Only List is only applicable to claims made to CMS, it is often used as an industry-wide guide to assess which procedures are sufficiently complex such that they should only be performed on an inpatient basis.

Kingwood is entitled to be paid $25,482.06 for the medically necessary, covered services it provided to Patient 1.

42.    <u>Patient 2, Admitted and Discharged in 2022</u>: At the time the services were rendered, Patient 2 was a 59-year-old female who presented with continued and worsening left knee pain following a left knee arthroscopy in 2021. Patient 2 reported decreased mobility, stiffness, restricted motion, popping, crunching, and knee failure. Patient 2 had previously engaged in conservative treatment by way of oral pain medications, physical therapy, activity modifications, and home exercise, without improvement. Following the course of conservative treatment, Patient 2's physician recommended that she undergo surgical intervention. As such, Patient 2 presented at TOH and underwent left total knee arthroplasty without complications. Post-operatively, Patient 2 was admitted as an inpatient, per physician order, to control her pain. During her admission, she was evaluated by and participated in physical therapy. Once Patient 2 was medically cleared, she was discharged home in stable condition the day after her procedure.

43.    On April 2, 2022, Patient 2 preregistered for her surgery with coverage under a Highmark PA health plan. Prior to the procedure, Highmark PA authorized the surgery in question via authorization #4027919/I. On May 5, 2022, TOH faxed Patient 2's clinicals to Highmark PA.

44.    On May 11, 2022, TOH timely submitted a claim to BCBSTX for forwarding to Highmark PA for the pre-surgical services that were provided to Patient 2. Subsequently, on May 12, 2022, TOH timely submitted a separate claim for Patient 2's surgical services and inpatient admission. On May 14, 2022, TOH spoke with a representative of Quantum Health (an agent of Highmark PA) who stated that all inpatient days would be covered per the pre-authorization that was previously issued.

45.    On May 26, 2022, BCBSTX, on behalf of Highmark PA remitted payment in full

<u>**PLAINTIFFS' ORIGINAL COMPLAINT**</u>                                    **Page 18**

for the pre-surgical services that were provided to Patient 2; however, by remittance dated June 7, 2022, Highmark PA denied TOH's claim for the surgical services and inpatient admission in full on the basis that such services were not authorized, despite previously authorizing such services and representing that all inpatient days would be covered.

46.     On July 5, 2022, TOH submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. Specifically, TOH stated in its appeal that Highmark PA had authorized the services that were provided, and thus, denial on that basis was improper. On July 26, August 2, and August 9, 2022, TOH spoke with BCBSTX representatives who confirmed that Highmark PA had received the appeal and that it was under review. Finally, on August 16, 2022, TOH again spoke with a BCBSTX representative who stated that Highmark PA closed the appeal, as they claimed that medical records were not submitted with it. Highmark PA did not submit a request for medical records prior to this date, and moreover, Patient 2's clinicals had been provided to Highmark PA with TOH's appeal.

47.     Subsequently, on September 1, 2022, TOH timely submitted a corrected claim to BCBSTX for forwarding to Highmark PA for all dates of service, including the pre-surgical services, and billed for an observation level of care instead of inpatient. Via correspondence dated September 13, 2022, TOH was informed that Highmark PA determined the corrected claim could not be processed and should be resubmitted with the prior claim number.

48.     On September 22, 2022, and again on September 26, 2022, TOH timely submitted a corrected claim to BCBSTX for forwarding to Highmark PA for all dates of service, including the pre-surgical services, and billed for an observation level of care instead of inpatient. On September 30, 2022, TOH spoke with a BCBSTX representative who stated that the corrected claim was still

being processed. On October 7, 2022, TOH spoke with a BCBSTX representative who stated that Highmark PA had overturned its previous denial, and the claim was being reprocessed. On October 17, 2022, TOH spoke with a BCBSTX representative who stated that the corrected claim was still being reprocessed and should be completed in 30 to 60 days.

49.    On October 24, 2022, TOH spoke with a BCBSTX representative who stated that the corrected claim allegedly referenced the wrong claim number and that TOH would need to send a void request for the previous claim. The representative stated that once the prior claim was voided, the corrected claim could be reprocessed.

50.    On October 26, 2022, TOH timely submitted another corrected claim to BCBSTX for forwarding to Highmark PA for all dates of service with the requested claim number. Via remittance from BCBSTX dated November 1, 2022, Highmark PA denied the corrected claim in full on the basis that "coverage/program guidelines were not met." The remittance did not specify what coverage or program guidelines were not met. Via remittance dated November 4, 2022, Highmark PA denied the claim in full and recouped the previous payment for the pre-surgical services on the basis that the services were not authorized.

51.    The denial of TOH's claim for services rendered to Patient 2 on the basis of alleged lack of authorization constituted a wrongful denial of benefits and should be reversed.

52.    First, Highmark PA authorized the services rendered to Patient 2. Highmark PA is prohibited by Texas law from denying payment for TOH's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f) ("If an insurer has preauthorized medical care or health care services, the insurer may not deny or reduce payment to the physician or health care provider for those services based on medical necessity or appropriateness of care."). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a

finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

53.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite TOH's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 2's medical records.

54.    Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

55.    Finally, Highmark PA suffered no prejudice due to any alleged lack of authorization, because TOH rendered medically necessary care to Highmark PA's member, and Highmark PA has never challenged the appropriateness of the care provided to Patient 2, and, in fact, authorized such services.

56.    In sum, TOH provided medically necessary, covered services to Patient 2 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, TOH is entitled to be paid $36,275.12 for the medically necessary, covered services it provided to Patient 2.

57.    Patient 3, Admitted in 2022 and Discharged in 2023: At the time the services were rendered, Patient 3 was a female infant who was prematurely born at CCMC at 30 weeks gestation due to a premature onset of labor. Following delivery of Patient 3, she was admitted to the neonatal intensive care unit ("NICU") at CCMC for prematurity and respiratory distress per physician order. She was placed on Vapotherm at 5 liters (L) per minute. Patient 3 was started on calcium gluconate until total parenteral nutrition was started. Umbilical arterial and venous lines were placed. Patient

3 was started on intravenous antibiotics while cultures were pending. She was at risk for apnea and started on caffeine with maintenance dosing planned to begin 24 hours later. She was given dextrose bolus followed by continuous dextrose infusion due to hypoglycemia. She was also ordered to ingest nothing by mouth and to continue intravenous fluids (dextrose), sodium acetate, and total parenteral nutrition.

58.     Patient 3 had an umbilical arterial catheter placed on the first day of her admission. She was treated with Vapotherm until the sixth day of her admission. She received IV antibiotics for the first three days of her admission and again for three days later in her admission while undergoing a workup for infection after she was pale and irritable with a few bradycardia and desaturation events. Chest x-ray and kidneys/ureters/bladder screens were performed and reviewed. Patient 3's white blood cell count was low and C-reactive protein was elevated. Patient 3 was given a blood transfusion for low hematocrit levels one month after her admission, which stabilized her levels within a week. A week and three days prior to her discharge, Patient 3's C-reactive protein trended down, and her blood and urine cultures were negative. Patient 3 received caffeine citrate every 12 hours for 17 days total, beginning on her first day of admission. Patient 3 received phototherapy for four total days. Initially during her hospitalization, oral feedings were not possible, and an attempted oral feeding led to desaturation and monitoring for 72 hours; however, on the last day of her admission, Patient 3 was able to orally feed with her mother every three hours and gained 100 grams in 24 hours. Once Patient 3's blood work and underlying conditions were stabilized and she was able to orally feed, she was discharged home with a plan to follow up with her pediatrician in one to two days. In total, Patient 3 was admitted for 40 days at CCMC.

59.     Patient 3's mother presented at CCMC with coverage under a Highmark PA health plan. CCMC timely provided notice of Patient 3's admission on December 5, 2022 and sent Patient

3's clinicals to Highmark PA. It was determined on January 6, 2023 that Patient 3 had been added to her mother's Highmark PA plan and that 31 inpatient days had been automatically approved. Updated clinicals including Patient 3's discharge summary were provided to Highmark PA on January 13, 2023.

60.      On January 16, 2023, CCMC contacted a Highmark PA representative who stated that they could not find Patient 3 in their member database. Subsequently, CCMC contacted Quantum Health (an agent of Highmark PA) on January 25, 2023 who stated that they would correct the issue with the member database, obtain authorization for the dates of service, and submit the case for review. Following this call, CCMC sent updated clinicals to Highmark PA the same day.

61.      On January 31, 2023, CCMC contacted a Quantum Health representative who stated that the request for authorization was still pending. On February 7, 2023, CCMC was able to confirm via phone call and correspondence that Highmark PA had authorized all dates of service under authorization number 20230125-002526/I.

62.      On January 17, 2023, CCMC timely submitted a claim to BCBSTX for forwarding to Highmark PA for the services it provided to Patient 3. Subsequently, via remittance dated January 18, 2023, BCBSTX, on behalf of Highmark PA, requested an itemized bill in order to process the claim. CCMC subsequently sent an itemized bill and Patient 3's medical records to BCBSTX for forwarding to Highmark PA.

63.      On February 20, 2023, CCMC received a correspondence from BCBSTX, on behalf of Highmark PA, stating that $34,686.58 of the total charges had been determined to be ineligible under their Clinical Payment and Coding Policy for inpatient/outpatient unbundling. No specific reason or provision from such policy was cited in this letter.

64.      On March 2, 2023, CCMC contacted a representative of BCBSTX who stated the

itemized bill had been received and was under review. Over the next month, CCMC contacted BCBSTX no fewer than three times and was informed each time that the claim was sent for reprocessing and that additional time was needed.

65.    On May 15, 2023, CCMC spoke with a BCBSTX representative who stated the claim and itemized bill were received, that the claim was being reviewed based on the authorization for all dates of service, and that no additional information was needed at that time.

66.    On May 31, 2023, CMCC was informed by a representative of BCBSTX that the claim was still pending review by Highmark PA.

67.    Via correspondence on June 29, 2023, Highmark PA stated that only 39 of the 40 total days of Patient 3's admission were authorized. This correspondence instructed CCMC to contact Quantum Health to obtain authorization for all 40 days.

68.    On June 30, 2023, the claim was timely split-billed for the last date of services on an outpatient basis and for the first 39 days of services at inpatient status that was authorized. On July 10, 2023, Highmark PA paid $81.43 toward the outpatient claim only.

69.    On August 16, 2023, CCMC spoke to a BCBSTX representative who stated that the inpatient claim was still under review by Highmark PA and that no additional information was needed at that time. Subsequently, CCMC received correspondence from BCBSTX, on behalf of Highmark PA, stating that per Patient 3's benefits, authorization was required for the denied services and that authorization was only approved for 39 inpatient days. The correspondence further instructed CCMC to contact Quantum Health to obtain authorization for the final date of service, which had already been paid.

70.    Via BCBSTX remittance on September 8, 2023, Highmark PA denied the inpatient claim on the basis that the services were not authorized, despite all 39 inpatient days having been

previously authorized.

71.     Then, on September 12, 2023, BCBSTX, on behalf of Highmark PA, sent a correspondence to CCMC stating that the claim could not be processed because the required authorization identification number was not on file and that the charges were Patient 3's responsibility.[15]

72.     On September 19, 2023, CCMC timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 3's medical records, and requested a medical necessity review. The appeal correctly stated that Highmark PA had, in fact, authorized the inpatient admission for 39 days. Via correspondence on November 27, 2023, CCMC was informed that Highmark PA had denied its first-level appeal on the basis that Patient 3's inpatient admission began two months before authorization was obtained, and therefore, a provider sanction was applied on the basis that such authorization was not timely.

73.     On December 7, 2023, CCMC timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 3's medical records, and requested a medical necessity review. Subsequently, Highmark PA denied CCMC's second level of appeal on the same grounds as the first-level appeal.

74.     The denial of CCMC's claim for services rendered to Patient 3 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

75.     First, the services were authorized by Highmark PA, which Highmark PA acknowledged. CCMC timely provided notice of Patient 3's admission within one day of such admission. Ultimately, Highmark PA's decision to delay authorization of services for almost two

---

[15] Per the terms of the Gulf Coast Agreement, CCMC is not allowed to bill patients/Subscribers for services that were denied.

months is not a valid reason to deny payment of a claim that was in fact authorized. Further, Highmark PA is prohibited by Texas law from denying payment for CCMC's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

76.     Further, Highmark PA is prohibited under federal law from denying at least some portion of Patient 3's post-delivery admission. *See* Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935 ("NMHPA").

77.     Further, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite CCMC's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 3's medical records.

78.     Finally, Highmark PA suffered no prejudice due to any alleged lack of authorization, because CCMC rendered medically necessary care to Highmark PA's member, and Highmark PA has never challenged the appropriateness of the care provided to Patient 3, and, in fact, authorized such services.

79.     In sum, CCMC provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, CCMC is entitled to be paid $314,118.39 for the medically necessary, covered services it provided to Patient 3.

80.     Patient 4, Admitted and Discharged in 2023: At the time the services were rendered, Patient 4 was a 29-year-old male who presented to Rio Grande's emergency department

complaining of right lower quadrant pain that was exacerbated by movement or touch. Patient 4 had a fever and reported decreased appetite. Initial testing revealed tachycardia, fever, leukocytosis, and concerns for ruptured appendicitis. Patient 4 was initiated on IV fluids, antibiotics, and analgesics, and surgery was consulted. He was admitted as an inpatient to Rio Grande for further evaluation and treatment per physician order. On the second day of his admission, Patient 4 underwent a laparoscopic appendectomy with an infection washout without complication. He received standard post-operative management. His Jackson Pratt drain output was monitored, his pain was controlled, his diet was advanced as tolerated, and he completed a 5-day course of intravenous antibiotics. Once Patient 4 was determined to be medically stable, he was discharged home on his fifth day of admission with prescriptions and follow-up orders.

81.     Patient 4 presented to Rio Grande with coverage under a Highmark PA health plan. Notice of admission was timely provided to Highmark PA within 24 hours of his admission, along with Patient 4's clinicals. Updated clinicals were provided to Highmark PA on April 18, 2023.

82.     On April 27, 2023, Rio Grande spoke with a representative of Highmark PA who stated that all communications regarding authorizations should go through its agent, Quantum Health. On May 3, 2023, Rio Grande spoke with a representative of Quantum Health, who stated the request for authorization was pending and that it could take up to 30 days for a determination to be made. Following the call, Rio Grande faxed Patient 4's updated clinical to both Quantum and Highmark PA. Via correspondence on or about May 5, 2023, Rio Grande was informed that Patient 4's inpatient admission had been authorized under Reference #20230428-000098/I for all dates of service.

83.     On May 9, 2023, Rio Grande timely submitted its claim for the medically necessary services provided to Patient 4 to BCBSTX for forwarding to Highmark PA, with the authorization

number included on the claim form. Via remittance dated May 16, 2023, Rio Grande was informed that Highmark PA had denied the claim in full because, allegedly, "coverage/program guidelines were not met." The remittance did not state what specific coverage/program guidelines were not met. Via remittance received on June 6, 2023, Rio Grande was informed that Highmark PA denied the claim on the basis that the services were allegedly not authorized, despite Rio Grande receiving confirmation of authorization, and that the charges were Patient 4's responsibility.

84.    On June 15, 2023, Rio Grande spoke with a representative of Quantum Health, who confirmed that Patient 4's inpatient admission was authorized for all dates of service and that notice of this authorization had been provided to Highmark PA.

85.    On June 15, 2023, Rio Grande timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. On July 17, 2023, Rio Grande spoke with a representative of BCBSTX who confirmed receipt of the appeal and requested additional documents to be submitted along with the medical record and appeal letter. These additional documents were sent to BCBSTX for forwarding to Highmark PA on July 18, 2023, along with the previously submitted appeal letter and medical records. On August 15, 2023, Rio Grande spoke with a representative of BCBSTX who stated that all documents had been received and that additional time was needed to complete the review. Via correspondence on September 15, 2023, Rio Grande was informed that Highmark PA had denied its appeal on the basis that the services provided were not authorized.

86.    On September 20, 2023, Rio Grande spoke with a representative of BCBSTX who stated that Highmark PA had upheld its denial of the claim on the basis that authorization was not obtained for the services within 72 hours of admission. The same day, Rio Grande spoke with a representative of Quantum Health who stated that all dates of service had been authorized, but

Highmark PA had applied a 100% provider sanction on the basis that the authorization was not obtained within 72 hours of admission.

87.     On September 20, 2023, Rio Grande timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 4's medical records, and requested a medical necessity review. Via correspondence on September 22, 2023, Rio Grande was informed that Highmark PA denied its second appeal on the same grounds as its previous appeal.

88.     The denial of Rio Grande's claim for services rendered to Patient 4 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

89.     First, the services were authorized by Highmark PA, which Highmark PA acknowledged. Rio Grande timely provided notice of Patient 4's admission within 24 hours of his admission. Ultimately, Highmark PA's decision to delay authorization of services for more than 72 hours is not a valid reason to deny payment of a claim that was in fact authorized. Further, Highmark PA is prohibited by Texas law from denying payment for Rio Grande's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

90.     Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Rio Grande's request for the same. The services rendered were medically necessary as evidenced by Patient 4's medical records.

91.     Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law.

*See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

92.     Finally, Highmark PA suffered no prejudice due to any alleged lack of authorization because Rio Grande rendered medically necessary care to Highmark PA's member, and Highmark PA has never challenged the appropriateness of the care provided to Patient 4, and, in fact, authorized such services.

93.     In sum, Rio Grande provided medically necessary, covered services to Patient 4 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Rio Grande is entitled to be paid $69,789.96 for the medically necessary, covered services it provided to Patient 4.

94.     <u>Patient 5, Admitted and Discharged in 2023</u>: At the time the services were rendered, Patient 5 was a 44-year-old male who presented to CCMC's emergency department via ambulance as a code 3 en route with CPR in process. The patient was found in ventricular fibrillation in his home by emergency medical technicians ("EMTs"). The EMTs used a defibrillator on him twice, and left tibial intraosseous vascular access was obtained. He was noted by the EMTs to have a large tympanic abdomen and was bagged with CPR in progress. The patient was intubated with continued CPR and was shocked two more times in CCMC's emergency department. Eventually, emergency department practitioners were able to reestablish Patient 5's spontaneous circulation, and he was started on an amino infusion. Patient 5's lab work revealed an initial lactic acid of 11.8, potassium of 2.9, creatinine 1.55, high sensitivity troponin 2035, BNP  581, AST 120, ALT 142, and serum alcohol 103. Per Patient 5's wife, he had a history of seizure disorder, coronary artery bypass graft ("CABG"), pacemaker, and ablations for atrial fibrillation. Patient 5's wife stated he was sitting in a chair playing computer games after drinking beer earlier in the day, when he fell out of the chair and passed out. Patient 5's wife started CPR and called the EMTs.

95.    Subsequently, Patient 5 was admitted to the ICU for further evaluation and treatment. Patient 5 was self-extubated on the fourth day of his admission and placed on non-invasive ventilation. The patient continued to be in atrial fibrillation with rapid ventricular rate and highly elevated blood pressure and was placed on a nicardipine drip, amino drip, and oral digoxin. Cardiology and critical care were consulted. Patient 5 was also treated for community-acquired pneumonia with Meropenem. The patient underwent a bronchoscopy on his second and fourth day of admission. Neurology was consulted for hypoxic brain injury and wanted to obtain an MRI to evaluate, but Patient 5 was unable to undergo an MRI. Patient 5 underwent a transthoracic echocardiogram that showed an ejection fraction of 30-34%, no reginal wall motion abnormality, and normal left ventricle diastolic function. He underwent automatic implantable cardioverter defibrillator placement on the tenth day of his admission. He had an upgrade from an existing dual-chamber pacemaker into dual chamber implantable cardioverter defibrillator, adding a new right ventricular lead into the left shoulder and tunneling. He was also treated with guideline-directed medical therapy for congestive heart failure. Cardiology recommended that Patient 5 undergo a left heart catheterization prior to discharge, but the Patient needed to be more medically stable in order to do so. Patient 5 eventually underwent a left heart catheterization on his second to last day of admission, which showed a patent CABG. Patient 5 was discharged to a long-term acute care facility thereafter.

96.    Patient 5 presented to CCMC's emergency department with coverage under a Highmark PA health plan and was admitted as an inpatient the same day per physician order. CCMC timely provided notice of Patient 5's admission and his clinicals to Highmark PA. On August 10, 2023, CCMC spoke to a Highmark PA representative who stated that Patient 5's inpatient admission was authorized for a total of nine days under authorization #1240846.

97.     From August 14 through August 18, 2023, CCMC faxed updated clinicals to Highmark PA. On August 15, 2023, CCMC spoke to a Highmark PA representative who stated that the inpatient admission was authorized for 10 days until August 15, 2023, authorization for additional days was still pending, and to wait 48 hours before calling back for additional information. On August 21, 2024, CCMC was informed that the inpatient admission had been authorized through August 24, 2023.

98.     Via correspondence dated August 31, 2023, CCMC was informed that Highmark PA had denied authorization for Patient 5's inpatient admission from August 25, 2023 onward. CCMC was further informed that it could request a peer-to-peer review of the authorization denial. On September 7, 2023, CCMC was informed that the peer-to-peer review was completed and that Highmark PA had upheld its denial of authorization from August 25 onward.

99.     On September 12, 2023, CCMC timely submitted a claim to BCBSTX for forwarding to Highmark PA for the services it provided to Patient 5. Via remittance dated September 18, 2023, Highmark PA denied the claim in full on the basis that the charges were not covered and advised CCMC to consult Patient 5's plan benefit documents/guidelines for information about restrictions for this service. CCMC was not provided with a copy of Patient 5's plan benefit documents or guidelines. On October 26, 2023, CCMC spoke with a representative of BCBSTX who stated that the only exclusion Patient 5's plan had for services was for bariatric surgery, which was not performed by CCMC; therefore, all services provided by CCMC should be covered. In subsequent calls, BCBSTX representatives advised CCMC that information had been forwarded to Highmark PA for review, including the authorization of the services through August 25.

100.    CCMC timely submitted its first-level appeal to BCBSTX for forwarding to

Highmark PA, enclosed a copy of Patient 5's medical records, and requested a medical necessity review. On December 29, 2023, CCMC spoke with a representative of BCBSTX who stated the appeal had been received; however, it had not yet been forwarded to Highmark PA. On January 5, 2024, CCMC spoke with a representative of BCBSTX who stated that Highmark PA had upheld its denial in response to the appeal on January 2, 2024 on the basis that the services provided were not medically necessary.

101.    On January 24, 2024, CCMC timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 5's medical records, and again requested a medical necessity review. On February 21, 2024, CCMC spoke to a BCBSTX representative who stated Highmark PA had denied the claim because of two issues. First, only 21 days of service were authorized, but Patient 5's total billed admission was for 26 days, and therefore, the additional days would need to be authorized before the claim could be reprocessed. Second, because certain diagnosis codes on the bill related to obesity (Z68.42 and E66.01) there was a question as to whether the services were eligible for reimbursement. The representative stated that CCMC would need to contact Highmark PA's eligibility department to confirm whether the services provided to Patient 5 were excluded under his health benefit plan (despite previously being advised that they were not excluded). On February 29, 2024, CCMC spoke to a BCBSTX representative who stated that Highmark PA had upheld its denial in response to the second appeal on the basis that the services were not medically necessary.

102.    On March 4, 2024, CCMC was advised that Highmark PA would not issue retroactive authorization for the additional five days of Patient 5's admission. As such, CCMC timely submitted a split-bill claim for (1) the authorized 21 days of service, and (2) the 5 additional dates of service. Highmark PA subsequently denied both claims and informed CCMC that all

appeals had been exhausted for this matter.

103.    The denial of CCMC's claim for services rendered to Patient 5 on the basis of a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

104.    First, the services were authorized by Highmark PA for the first 21 days of admission, which Highmark PA acknowledged. Ultimately, Highmark PA's decision to deny authorization of the additional five days of service is not a valid reason to deny payment of the 21 authorized days. Further, Highmark PA is prohibited by Texas law from denying payment for CCMC's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

105.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite contending that such denial was on the basis of medical necessity, and despite CCMC's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 5's medical records.

106.    Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

107.    In sum, CCMC provided medically necessary, covered services to Patient 5 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, CCMC is entitled to be paid $308,061.81 for the medically necessary, covered services it provided to Patient 5.

108.    <u>Patient 6, Admitted and Discharged 2021:</u> At the time the services were rendered, Patient 6 was a 54-year-old male who presented to Las Palmas MC's emergency department with reports of a cough, shortness of breath, and fever. He stated that he started feeling unwell about three to four days before presenting to Las Palmas MC. In the emergency department, it was determined that he was febrile, and a chest x-ray showed middle lobe infiltrate, which gave concern for pneumonia. Patient 6 was admitted as an inpatient, per physician order, and started on broad spectrum antibiotics. During his admission, a chest CT was performed, and it confirmed Patient 6 had right lower lobe pneumonia. Patient 6 was discharged home after a three-day inpatient admission, once medically cleared.

109.    The day after Patient 6's admission, Las Palmas MC timely notified Highmark PA and requested authorization for the admission. On August 19, 2021, Las Palmas MC spoke to a Highmark PA representative who stated that they were unable to locate the authorization request but to submit the claim for payment anyway.

110.    On August 23, 2021, Las Palmas MC timely submitted its claim for the services provided to Patient 6 to BCBSTX for forwarding to Highmark PA. Las Palmas MC submitted Patient 6's updated medical records to Highmark PA on August 27, 2021.

111.    On October 28, 2021, Highmark PA requested that Las Palmas MC rebill the claim due to the dates of service being mismatched. Las Palmas MC immediately complied and timely billed a corrected claim the next day. Nonetheless, Highmark PA denied the claim on November 26, 2021 for a purported lack of authorization/notification.

112.    On December 21, 2021, Las Palmas MC timely submitted a request for retroactive authorization and first level of appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 6's medical records, and requested a medical necessity review. BCBSTX, on behalf

of Highmark PA, informed Las Palmas MC that it had not received the appeal, so Las Palmas MC timely resubmitted the appeal on January 12, 2022.

113.    On February 2, 2022, a BCBSTX representative informed Las Palmas MC that the appeal was received on January 21, 2022 and was being reviewed. On March 17, 2022, Las Palmas MC was informed that Highmark PA had upheld its denial for a purported lack of authorization.

114.    On March 31, 2022, Las Palmas MC timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 6's medical records, and again requested a medical necessity review. On April 29, 2022, Las Palmas MC was informed that the appeal was received. On June 14, 2022, after Las Palmas MC followed up seven times previously, a BCBSTX representative informed Las Palmas MC that Highmark PA had upheld its denial for a purported lack of authorization on June 8, 2022.

115.    The denial of Las Palmas MC's claim for services rendered to Patient 6 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

116.    First, Patient 6 presented to Las Palmas MC via the emergency department, and Las Palmas MC timely notified Highmark PA of Patient 6's inpatient admission within 24 hours of his admission. Highmark PA did not acknowledge or act upon this notice of admission and request for authorization.

117.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal as provided for in the El Paso Agreement, despite Las Palmas MC's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 6's medical records.

118.    Further, at least some portion of the billed services constituted emergency and post-

stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

119.    Finally, Highmark PA suffered no prejudice due to any alleged lack of authorization, because Las Palmas MC rendered medically necessary care to Highmark PA's member, and Highmark PA has never challenged the appropriateness of the care provided to Patient 6.

120.    In sum, Las Palmas provided medically necessary, covered services to Patient 6 and is entitled to payment in full for those services. According to the terms of the El Paso Agreement, Las Palmas is entitled to be paid $27,242.38 for the medically necessary, covered services provided to Patient 6.

121.    <u>Patient 7, Admitted and Discharged in 2021:</u> At the time services were rendered, Patient 7 was a 64-year-old female who presented to South Austin MC's emergency department via ambulance, with a prior diagnosis of stage III lung cancer. When she presented to South Austin MC, she was febrile and neutropenic. She was admitted as an inpatient to the oncology ICU of South Austin MC for neutropenic fever per physician order. During her 60-day inpatient admission, Patient 7 underwent numerous serious procedures and treatments, including (1) a left below-knee amputation, (2) placement and removal of a McNamara infusion catheter at the left popliteal, (3) a bronchoscopy, (4) multiple right lower extremity angiograms to attempt to prevent a double amputation, (5) removal of common bile duct stones, (6) a thrombectomy and percutaneous transluminal angioplasty,  (7) a blood transfusion, and (8) intubation.  Patient 7 was also noted to be critically ill with one or more organ system failures. Once she was medically stable, Patient 7 was discharged to a skilled nursing facility.

122.    South Austin MC timely notified Highmark PA of Patient 7's inpatient admission. On October 19, 2021, Highmark PA denied the request for authorization for a purported lack of medical necessity. However, after performing a peer-to-peer review, on October 21, 2021, Highmark PA authorized the first four days of Patient 7's admission under authorization #REQ-15467257, stating that "based on our review of all the medical information provided at the time of review, the services(s) … [were] approved because it satisfies the criteria for establishing medical necessity and appropriateness."

123.    South Austin MC continued to submit updated medical records to Highmark PA for Patient 7's ongoing inpatient admission. Throughout Patient 7's inpatient admission, South Austin MC received twelve authorizations for a total of 59 days of inpatient treatment, all under authorization number #REQ-16029516. Highmark PA, however, denied authorization for Patient 7's last day of admission.

124.    On December 23, 2021, South Austin MC timely submitted its claim for the services rendered to Patient 7 to BCBSTX for forwarding to Highmark PA. Originally, on January 25, 2022, Highmark PA paid $340,551.87 on the claim, which was an underpayment of $147,470.85, purportedly due to certain coding issues. South Austin MC disputed these coding issues and the underpayment.

125.    South Austin MC submitted two different appeals contesting the coding disagreements on January 27, 2022 and February 3, 2022. Despite these appeals, Highmark PA maintained that the coding was incorrect.

126.    Via correspondence dated April 1, 2022 sent from BCBSTX on behalf of Highmark PA, Highmark PA requested a refund of the entire $340,551.87 payment, alleging that the claim

was submitted by South Austin MC in error. Highmark PA subsequently recouped the entire payment.

127.    On September 29, 2022, South Austin MC timely submitted a request for reconsideration as its first level of appeal to BCBSTX for forwarding to Highmark PA, in which it contested the recoupment, enclosed a copy of Patient 7's medical records, and requested a medical necessity review. After months of continuous follow-up, South Austin MC was informed that Highmark PA denied the appeal for a purported lack of medical necessity, despite 59 days of admission having been authorized by Highmark PA.

128.    On February 28, 2023, South Austin MC timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 7's medical records, and again requested a medical necessity review. In this appeal, South Austin MC specifically referenced the 59 authorized days of inpatient admission.

129.    On June 6, 2023, South Austin MC spoke to a BCBSTX representative who stated that Highmark PA had advised that services were medically necessary through and until the last day of Patient 7's inpatient admission. Thus, the medical necessity issue did not affect 59 days of Patient 7's admission. Highmark PA, however, ultimately denied South Austin MC's second level of appeal.

130.    On July 14, 2023, South Austin MC spoke to a BCBSTX representative who stated that Highmark PA had voided the claim. Via remittance on July 21, 2023, South Austin MC was notified that Highmark PA was unable to split processing of the claim (the approved 59 days and the one non-authorized day). Highmark PA requested that South Austin MC refile the claim as a split bill, separating the authorized days from the non-authorized day. South Austin MC immediately complied, filing two separate claims on July 26, 2023.

131. On August 9, 2023, despite requesting that South Austin MC rebill the claim as a split claim due to an inability of Highmark PA to process the full claim in its system, Highmark PA denied the split claims purportedly on the basis that they were not timely filed.

132. On September 5, 2023, however, after South Austin MC contested the denial for timely filing, Highmark PA paid the claim for the unauthorized dates of service but not the claim for the authorized dates of service. Highmark PA never paid for the dates of service it authorized.

133. The denial of South Austin MC's claim for the services it rendered to Patient 7 on the basis of a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

134. First, Highmark PA authorized 59 days of inpatient admission but then denied those same dates of service for alleged lack of medical necessity. Under the terms of the St. David's Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here. Further, Highmark PA is prohibited by Texas law from denying payment for South Austin MC's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f).

135. Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite South Austin MC's request for the same. The services rendered were medically necessary as evidenced by Patient 7's medical records.

136. Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

137.    In sum, South Austin MC provided medically necessary, covered services to Patient 7 and is entitled to payment in full for the denied dates of service. According to the terms of the St. David's Agreement, South Austin MC is entitled to be paid $461,306.41 for the medically necessary, covered services it provided to Patient 7.

138.    <u>Patient 8, Admitted and Expired in 2022</u>: At the time the services were rendered, Patient 8 was a 47-year-old male patient with a long-standing medical history of diabetes mellitus type 2 and obstructive sleep apnea who presented to Del Sol MC's emergency department, complaining of generalized weakness, head and neck congestion, a persistent dry cough, and increasing shortness of breath. When Patient 8 arrived at the ED, his treating physicians found he was hypoxic and COVID-19 positive. He was admitted as an inpatient per physician order and received frequent respiratory therapy interventions and COVID-19 treatment. Despite treatment and respiratory therapy, Patient 8's condition continued to decline, and he required increased oxygen. Patient 8 was eventually intubated and transferred to Del Sol MC's Critical Care Unit. Patient 8's symptoms continued to worsen, requiring increased sedation and blood pressure support. Ultimately, Patient 8 arrested and expired. Patient 8 was pronounced dead after a 27-day inpatient admission.

139.    On January 31, 2022, Del Sol MC timely faxed Patient 8's clinicals to Highmark PA.  On February 1, 2022, however, Highmark PA denied authorization of the admission for lack of medical necessity based on alleged failure to provide clinicals. On March 1, 2022, Del Sol MC spoke to a Highmark PA representative who stated Patient 8's clinicals were not received until February 4, 2022, after the denial letter was generated. On the same call, Highmark PA informed Del Sol MC that it would not perform an authorization review and appealing the denial was the only option. Via correspondence from BCBSTX dated March 14, 2022, an itemized bill for Patient

8 was requested. Del Sol MC promptly provided an itemized bill the next day. On April 4, 2022, Del Sol MC submitted Patient 8's medical records via mail.

140.    On March 9, 2022, Del Sol MC timely submitted its claim for the services it rendered to Patient 8 to BCBSTX for forwarding to Highmark PA. After receiving no information, payment, or claim adjudication for 84 days, on May 17, 2022, Del Sol MC sent an attorney demand letter to BCBSTX, requesting review of Patient 8's claim. On or about May 24, 2022, Del Sol MC was notified that Highmark PA had denied its claim.

141.    On May 27, 2022, Del Sol MC timely submitted its first-level appeal, enclosed Patient 8's medical records, and requested a medical necessity review. In June and July of 2022, Del Sol MC spoke to BCBSTX representatives no fewer than six times, all of whom stated that the appeal was still under review. Via correspondence dated July 29, 2022, Del Sol MC was informed that Highmark PA upheld its denial on the basis of a purported lack of medical necessity.

142.    On August 18, 2022, Del Sol MC timely submitted its second-level appeal, enclosed Patient 8's medical records, and again requested a medical necessity review. On September 15, 2022, Del Sol MC spoke to a BCBSTX representative who stated that Highmark PA had requested Patient 8's medical records. Del Sol MC informed this representative that the medical records were submitted along with the appeal. Via correspondence dated October 10, 2022, Del Sol MC was informed Highmark PA had upheld its denial on the basis of a purported lack of medical necessity.

143.    The denial of Del Sol MC's claim for services rendered to Patient 8 on the basis of a purported lack of medical necessary constituted a wrongful denial of benefits and should be reversed.

144.   First, Del Sol MC timely requested authorization of Patient's 9's inpatient admission and sent copies of his clinicals. Highmark PA denied authorization for failing to provide clinicals, which was incorrect. In fact, a Highmark PA representative subsequently confirmed that it had received the clinicals but would not retroactively provide authorization.

145.   Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the El Paso Agreement, despite Del Sol MC's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 8's medical records.

146.   Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

147.   In sum, Del Sol MC provided medically necessary, covered services to Patient 8 and is entitled to payment in full for those services. According to the El Paso Agreement, Del Sol MC is entitled to be paid $236,473.11 for the medically necessary, covered services it provided to Patient 8.

148.   <u>Patient 9, Admitted and Discharged in 2021:</u>   At the time the services were rendered, Patient 9 was a newborn female infant. Patient 9's mother presented to MC Plano in 2021 for a scheduled labor inducement. During labor, Patient 9 became stuck in the birth canal and the use of forceps was required to assist with delivery. Upon birth, Patient 9 presented pale and stunned. She was given an Apgar score—the standardized method for evaluating newborns—of one out of ten. She experienced respiratory failure upon birth and required positive pressure ventilation for several minutes to assist with breathing and gaining color. Patient 9's Apgar score

rose to an eight after five minutes, but she was noted to have deep forceps marks to the head with right temporal cephalohematoma, right eye swelling, and facial droop.

149.    Patient 9 was initially taken to the nursery for care; however, due to a decline in her hematocrit and platelet levels, she was later transferred and admitted to the NICU. Patient 9's treating physicians were concerned that she was experiencing a subgaleal hemorrhage. In the NICU, Patient 9 was treated with intravenous fluids and received general newborn care. She was closely monitored and received repeated imaging and lab work.

150.    While in the NICU, Patient 9 began experiencing seizures and decreased oxygenation, requiring her to be monitored by electroencephalogram for three days continuously. Patient 9 again required monitoring by electroencephalogram several days later. During Patient 9's admission in the NICU, she also experienced oliguria, which required treatment with intravenous Lasix and renal dopamine; jaundice and hyperbilirubinemia requiring phototherapy treatment; and continued respiratory difficulties requiring oxygen therapy.

151.    Patient 9 underwent numerous tests in the NICU, including repeated head imaging to monitor intracranial hemorrhage, skull fractures, and recurrent seizures.  Patient 9 also received neurosurgery consultations, nutrition evaluations, medication titration for seizure control, and general newborn medication management for multiple weeks until she was stable for discharge into the care of her mother.

152.    When Patient 9's mother arrived at MC Plano to be induced, she presented with Cigna insurance. MC Plano initially understood that Patient 9 would be added to her mother's Cigna plan upon birth. Cigna did not require pre-authorization of the delivery. Following Patient 9's admission to the NICU, MC Plano requested and received authorization from Cigna for the admission and dates of service that were anticipated for Patient 9.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                                    **Page 44**

153. On October 22, 2021, MC Plano sent Patient 9's clinical records via facsimile to Cigna, and on November 11, 2021, MC Plano sent updated medical records and a discharge summary for Patient 9. On November 12, 2021, MC Plano timely submitted a claim to Cigna for the services provided to Patient 9.

154. On November 19, 2021, a Cigna representative informed MC Plano that Patient 9 had not been added to her mother's Cigna plan. Accordingly, MC Plano called and sent a letter to the mother requesting that Patient 9 be added to her Cigna plan.

155. On November 23, 2021, MC Plano sent an itemized bill to Cigna, and on December 3, 2021, the claim was re-billed to Cigna. On December 12, 2021, MC Plano sent another itemized bill to Cigna for Patient 9. Via remittance dated December 17, 2021, Cigna approved the claim and paid $112,742.68.

156. On June 25, 2022, however, MC Plano received correspondence from Cigna requesting that Cigna be refunded the $112,742.68 it paid for the claim. Cigna claimed Patient 9 was instead covered by her father's insurance plan with Highmark PA, rather than the mother's Cigna plan, pursuant to the "Birthday Rule," which provides that primary insurance for a child is that of the parent whose birthday occurs earliest in the year. On July 18, 2022, MC Plano submitted a rebuttal letter to Cigna disputing Cigna's entitlement to recoupment.

157. On September 13, 2022, MC Plano timely submitted its claim for the medically necessary services provided to Patient 9 to BCBSTX for forwarding to Highmark PA. On September 22, 2022, BCBSTX communicated to MC Plano that the claim was denied on the basis that it did not comply with coverage guidelines, and specifically, that the services provided to Patient 9 were purportedly not authorized.

158.    MC Plano timely submitted its first-level appeal to BCBSTX on October 13, 2022 for forwarding to Highmark PA, enclosed a copy of Patient 9's medical records, and requested a medical necessity review. After requesting multiple status updates from BCBSTX on the appeal, BCBSTX notified MC Plano on November 30, 2022 that Highmark PA upheld the denial of the claim for a purported lack of authorization.

159.    MC Plano timely sent a second-level appeal to BCBSTX for forwarding to Highmark PA on December 2, 2022, enclosed a copy of Patient 9's medical records, and again requested a medical necessity review. After multiple requests for status updates, BCBSTX notified MC Plano on January 19, 2023 that Highmark PA upheld its denial of the claim for a purported lack of authorization. MC Plano timely re-billed the claim to BCBSTX for forwarding to Highmark PA on February 20, 2023 and again on March 13, 2023. Highmark PA denied both rebilled claims on the basis that the services provided were not authorized.

160.    The denial of MC Plano's claim for services rendered to Patient 9 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

161.    First, delivery of an infant does not require preauthorization. Under the NMHPA, health plans are required to provide coverage for a vaginal delivery and 48 hours of admission thereafter. *See* NMHPA. Pub. L. No. 104-204, 110 Stat. 2935. MC Plano did not learn that Highmark PA was the primary payor until almost six months after Cigna paid the claim. MC Plano timely submitted its claim to BCBSTX for forwarding to Highmark PA upon learning that Highmark PA was the primary payor for Patient 9.

162.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Plano's request for

the same. Further, the services rendered were medically necessary as evidenced by Patient 9's medical records.

163.     Third, Highmark PA suffered no prejudice due to any alleged lack of authorization because MC Plano rendered medically necessary care to Patient 9, and Highmark PA has never challenged the appropriateness of the care provided to Patient 9.

164.     In sum, MC Plano provided medically necessary, covered services to Patient 9 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Plano is entitled to be paid $66,320.00 for the medically necessary, covered services it provided to Patient 9.

165.     Patient 10, Admitted and Discharged in 2021:   At the time the services were rendered, Patient 10 was a 68-year-old male with a medical history of recurring follicular lymphoma with previous remission. Patient 10 initially presented to the emergency department of a hospital located in Allen, Texas complaining of increased shortness of breath and fever. Patient 10 was provided with antibiotics and then transferred to MC Dallas' emergency department for further care. Patient 10's medical history revealed recurring lymphoma and recent imaging studies showing a large mass on his left lung and right pleural effusion.

166.     Upon his arrival at the emergency department of MC Dallas, Patient 10 underwent a chest x-ray, which confirmed the presence of a large mass on his left lung and right pleural effusion. Patient 10 was then admitted as an inpatient per physician order and underwent thoracentesis with imaging.  Patient 10 was administered intravenous antibiotics and steroids, as well as supplemental oxygen. Patient 10 was also monitored for sepsis during his admission. Two days later, as Patient 10's fever reduced and his condition stabilized, Patient 10 underwent an

incisional biopsy of the left inguinal lymph node to determine whether the lymphoma had returned. Once deemed medically stable, Patient 10 was discharged the same day.

167.    When Patient 10 arrived at MC Dallas, he presented with Medicare as his primary insurance. On December 1, 2021, MC Dallas timely submitted a claim to Medicare for the services provided to Patient 10. On December 8, 2021, however, Medicare denied the claim on the basis that Medicare was not the primary payor.

168.    On December 12, 2021, MC Dallas was able to verify that Patient 10 was covered by a Highmark PA health plan, which was determined to be the primary payor. Accordingly, on December 17, 2021, MC Dallas timely submitted its claim for the medically necessary services provided to Patient 10 to BCBSTX for forwarding to Highmark PA.

169.    On December 21, 2021, BCBSTX sent MC Dallas a request for medical records. On December 31, 2021, MC Dallas sent copies of Patient 10's medical records to BCBSTX for forwarding to Highmark PA. On January 24, 2022, a BCBSTX representative informed MC Dallas that the records had been received and were in review. On February 17, 2022, BCBSTX again requested medical records for Patient 10. On February 18, 2022, MC Dallas spoke with a BCBSTX representative who advised that the claim was in coding audit.

170.    From March 31, 2022 to June 27, 2022, BCBSTX requested medical records for Patient 10 from MC Dallas on three more occasions, and after each request, a representative of MC Dallas spoke to a BCBSTX representative to confirm that the records had been received and were under review. On July 5, 2022, after MC Dallas had received no update on the claim, it spoke to a BCBSTX representative who alleged that medical records had not been received for Patient 10. MC Dallas sent Patient 10's medical records to BCBSTX again on July 7, 2022 for forwarding to Highmark PA.

171.    Via remittance on August 25, 2022, MC Dallas was informed that Highmark PA had denied the claim submitted for Patient 10 for a purported lack of authorization.

172.    On September 7, 2022, MC Dallas submitted its first-level appeal, enclosed a copy of Patient 10's medical records, and requested a medical necessity review. On October 13, 2022, Highmark PA responded to MC Dallas's appeal by claiming that Highmark PA would require an appointment of representative form signed by Patient 10 before it would review the appeal.

173.    During the pendency of the claim, Patient 10 passed away. On October 25, 2022, MC Dallas spoke with a Highmark PA representative and informed the representative that Patient 10 was deceased and could not sign an appointment of representative form (although MC Dallas does not agree that any such form was required). Highmark PA directed MC Dallas to contact a representative of the BlueCard Program for further instructions on how to proceed with the claim.

174.    MC Dallas contacted the BlueCard Program and explained the circumstances surrounding Patient 10's claim. A senior analyst with the BlueCard Program then reviewed the claim submitted by MC Dallas for Patient 10. On November 8, 2022, MC Dallas was notified that Highmark PA upheld the denial of the claim for a purported lack of authorization.

175.    The denial of MC Dallas' claim for services rendered to Patient 10 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

176.    No authorization is required for the provision of emergency and stabilization services. MC Dallas timely notified Highmark PA of the admission upon learning that Highmark PA was the primary payor for Patient 10. MC Dallas was unable to notify or obtain authorization from Highmark PA prior to Patient 10's admission to MC Dallas because Patient 10 presented with Medicare as his insurance.

177.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Dallas' request for the same. Further, the services rendered were medically necessary as evidenced by Patient 10's medical records.

178.    Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

179.    Fourth, Highmark PA has suffered no prejudice as a result of any alleged lack of authorization. MC Dallas rendered medically necessary care to Patient 10, and Highmark PA has never challenged the appropriateness of the care rendered to Patient 10.

180.    In sum, MC Dallas provided medically necessary, covered services to Patient 10 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Dallas is entitled to be paid $80,745.43 for the medically necessary, covered services it provided to Patient 10.

181.    Patient 11, Admitted and Discharged in 2022:    At the time the services were rendered, Patient 11 was a 55-year-old female with a history of lower back pain due to lumbar spondylolisthesis and lumbar radiculopathy. Patient 11 also suffered from cardiomyopathy that was managed with Carvedilol. Patient 11 presented at MC Plano for a scheduled lumbar spine surgery after three months of physical therapy, over-the-counter pain relievers, and bilateral L4/5 facet injections failed to permanently relieve her pain. Prior to presenting at MC Plano for surgery, Patient 11 experienced severe back pain that radiated into the right calf, resulting in numbness in her right toe. Patient 11 reported that the pain worsened with standing and walking.

182.    Patient 11 was covered by a Highmark PA health plan at the time services were provided. Via correspondence dated January 17, 2022, Highmark PA pre-authorized Patient 11's planned procedure and up to seven days of inpatient admission at MC Plano.

183.    At MC Plano, Patient 11 underwent a retroperitoneal spine exposure of the L4-5 and L5-S1 segments with mobilization of the iliac arteries and veins, aorta, vena cava and left ureter, and an anterior lumbar interbody fusion with arthrodesis, cage insertion, and fluoroscopy at the L4-5 and L5-S1 segments. Due to her history of cardiomyopathy managed with Carvedilol, implants were used in connection with Patient 11's surgery to promote healing and to minimize the risk of complications caused by her prolonged use of medication that is known to cause low blood pressure. Patient 11 recovered from the procedure without complications and was discharged after four days.

184.    On February 4, 2022, MC Plano timely submitted a claim for the services provided to Patient 11 to BCBSTX for forwarding to Highmark PA. On February 7, 2022, MC Plano received a request for medical records for Patient 11 from BCBSTX. MC Plano, however, had already submitted medical records for Patient 11 to BCBSTX for forwarding to Highmark PA. On February 11, 2022, MC Plano submitted an itemized bill for the services provided to Patient 11 to BCBSTX for forwarding to Highmark PA. On March 7, 2022, BCBSTX again requested medical records for Patient 11. MC Plano attempted to contact BCBSTX on March 7, 14, and 21, 2022, to explain that all records had already been submitted for Patient 11, but due to long wait times, MC Plano was unable to speak to a BCBSTX representative. BCBSTX sent yet another request for medical records to MC Plano on April 6, 2022. On April 18, 2022, MC Plano was able to reach a BCBSTX representative to confirm that the medical records and itemized bill for Patient 11 had been received and that the claim had been escalated for review.

185.    On May 3, 2022, because MC Plano had not yet received a response to the claim from Highmark PA, MC Plano submitted a letter to BCBSTX for forwarding to Highmark PA, in which it requested expedited processing of the claim. On May 19, 2022, MC Plano received correspondence from BCBSTX indicating that Highmark PA was unable to validate certain diagnosis codes on the claim and noting that one diagnosis related group code ("DRG code") used by MC Plano had been revised. On June 2, 2022, Highmark PA remitted $167,730.50 for the claim submitted for Patient 11, with a patient liability of $248.25, which constituted an underpayment of over $18,000.00, without explanation.

186.    MC Plano determined that Highmark PA had paid the claim based on older contractual rates, rather than then-effective rates in the North Texas Agreement between BCBSTX and MC Plano. MC Plano requested reconsideration by Highmark PA on June 15, 2022, and requested escalation of the claim on July 8, 2022. BCBSTX notified MC Plano that Highmark PA had downgraded the DRG code used by MC Plano in the claim submitted for Patient 11. On August 8, 2022, MC Plano submitted a dispute concerning the applicable DRG code to BCBSTX for forwarding to Highmark PA. Highmark PA did not make any additional payments on the claim submitted for Patient 11. On February 2, 2023, however, MC Plano did receive a remittance from another BCBS entity as secondary payor for Patient 11 in the amount of $38,688.15.

187.    On or about July 21, 2023, MC Plano received a request from Highmark PA for a refund of $100,536.72 of the funds that it paid for Patient 11's claim on the basis that the claim was allegedly submitted by the provider in error. MC Plano responded to Highmark PA that it disagreed with the refund request. On or about September 19, 2023, Highmark PA again requested a refund in the amount of $100,536.72 for services that the provider allegedly submitted in error.

Highmark PA alleged that some of the billed services or devices were experimental and investigational and/or not medically necessary.

188.    MC Plano confirmed that none of the services provided to Patient 11 or billing codes used in connection with Patient 11's claim were experimental or investigational. MC Plano attempted to dispute Highmark PA's refund request, but Highmark PA indicated that the time for disputing the request had expired. By remittance dated November 29, 2023, Highmark PA recouped the full $167,730.50 that it had paid on the claim on the basis that the items and services provided were not covered. On November 29, 2023, Highmark PA re-paid $85,277.60 for the claim.

189.    On November 28, 2023, MC Plano timely submitted a first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 11's medical records, and requested a medical necessity review. MC Plano also requested reconsideration of the underpayment based on the downgraded DRG code and of the November 29, 2023 recoupment. In the first-level appeal, MC Plano explained that the services provided to Patient 11 had been authorized by Highmark PA and that all services and devices provided to Patient 11 were medically necessary. Specifically, MC Plano explained that the use of implants was necessary in connection with Patient 11's procedure because, as reflected in her medical records, Patient 11 was diagnosed with cardiomyopathy, which was managed with Carvedilol, and therefore, presented a risk that Patient 11 would suffer complications due to low blood pressure.

190.    On December 26, 2022, MC Plano was advised by a BCBSTX representative that the appeal had been received on December 12, 2023 and was under review. In January, February and March of 2024, MC Plano repeatedly reached out to BCBSTX for updates on the status of the

appeal. On April 2, 2024, MC Plano spoke to a BCBSTX representative who stated that the appeal was still pending review by Highmark PA. MC Plano requested that the appeal be escalated.

191.    On February 27, 2024, while the first-level appeal was pending, Highmark PA requested a refund from MC Plano in the amount of $18,332.07 based on allegations that services included in the claim for Patient 11 were processed based on an incorrect allowable amount or provider discount. On March 7, 2024, MC Plano sent a letter to BCBSTX for forwarding to Highmark PA, in which it disputed that MC Plano had been overpaid. On or about April 18, 2024, Highmark PA recouped $85,277.60 and re-paid only $66,945.53, on the basis of alleged, unspecified billing errors. On April 19, 2024, MC Plano spoke with a BCBSTX representative who stated that the April 18, 2024 recoupment was purportedly due to a missing itemized bill.

192.    On April 19, 2024, following the second recoupment by Highmark PA, MC Plano submitted its second-level appeal, enclosed Patient 11's medical records, and requested a medical necessity review. On April 30, 2024, a BCBSTX representative confirmed that the appeal had been received and forwarded to Highmark PA for review. On or about May 1, 2024, MC Plano spoke with a BCBSTX representative who stated the second-level appeal was submitted prematurely because a decision had not yet been made on the first-level appeal. Via correspondence dated April 25, 2024, MC Plano was informed that Highmark PA upheld the denial of the claim submitted for Patient 11 in response to MC Plano's first-level appeal.

193.    On May 31, 2024, MC Plano timely re-billed the claim to BCBSTX for forwarding to Highmark PA with certain adjustments to the coding. On July 3, 2024, MC Plano contacted BCBSTX for an update on the claim, and a BCBSTX representative confirmed that it was under review by Highmark PA. Via remittance dated August 30, 2024, MC Plano was informed that Highmark PA would not make any further payments on the claim on the basis that items or services

included in the bills submitted for Patient 11 were allegedly not documented in Patient 11's medical records.

194.    The denial of MC Plano's claim for services rendered to Patient 11 constituted a wrongful denial of benefits and should be reversed.

195.    First, the services provided to Patient 11 were authorized and approved by Highmark PA prior to Patient 11's presentment at MC Plano, and MC Plano timely submitted all medical records and itemized bills to Highmark PA. The DRG codes utilized by MC Plano in its claim were valid and supported by Patient 11's medical records.  The services provided were medically necessary and not experimental or investigational. As stated in MC Plano's appeal, the use of implants during Patient 11's procedure was appropriate and medically necessary based on Patient 11's prior use of medication known to cause low blood pressure. Further, under the terms of the North Texas Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

196.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Plano's request for same. Further, the services rendered were medically necessary as evidenced by Patient 11's medical records.

197.    In sum, MC Plano provided medically necessary, covered services to Patient 11 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Plano is entitled to be paid $94,007.46 for the medically necessary, covered services it provided to Patient 11.

198.    <u>Patient 12, Admitted and Discharged in 2022:</u>  At the time the services were rendered, Patient 12 was a 40-year-old female with a recent diagnosis of High-Grade B-Cell

Lymphoma. Patient 12 originally presented to another hospital in Carrolton, Texas but was transferred to MC Plano for a higher level of care and for a consultation with an ear, nose, and throat doctor concerning a thyroid mass. Approximately nine days later, Patient 12 was transferred from MC Plano to MC Dallas for high-dose chemotherapy treatment following a new diagnosis of diffuse large B-Cell lymphoma with palpable thyroid mass, innumerable bilateral noncalcified pulmonary nodules, bilateral symmetric adrenal masses, soft tissue fullness along the urethra, vaginal, and distal anal canal, hepatic hypodensities, bilateral breast masses, and evidence of central nervous system involvement and leptomeningeal disease.

199.    Patient 12 was admitted as an inpatient at MC Dallas upon arrival per physician order. At MC Dallas, Patient 12 underwent imaging that revealed liver, adrenal, and lung lesions. Patient 12 underwent repeated MRIs of the brain region over the course of several days, which revealed abnormalities consistent with leptomeningeal and perineural metastasis.

200.    Because Patient 12's MRIs strongly indicated that the lymphoma had spread to the tissues surrounding her brain and spinal cord, as well as along her nerves, Patient 12 underwent a procedure for placement of an Ommaya reservoir—a small device implanted under the scalp to administer chemotherapy treatment to the brain and spinal cord. Patient 12 received two sessions of Methotrexate treatment administered through the Ommaya reservoir over the course of several days and was recommended by MC Dallas's hematology and oncology departments to remain inpatient until the Methotrexate had cleared her system. Once the Methotrexate cleared her system and she was deemed medically stable, Patient 12 was discharged to begin outpatient treatment.

201.    Patient 12 presented to MC Dallas with coverage under a Highmark PA health plan. Throughout Patient 12's inpatient admission, MC Dallas requested authorization for the services provided to Patient 12 and submitted Patient 12's medical records to Highmark PA. On April 4,

2022, Highmark denied authorization for services provided to Patient 12 based on alleged lack of medical necessity and offered to have a peer-to-peer discussion concerning the denial.

202.    MC Dallas continued to submit updated medical records to Highmark PA throughout Patient 12's inpatient admission but received no further response. From April 4, 2022 to May 9, 2022, MC Dallas attempted to contact Highmark PA no fewer than 10 times to schedule a peer-to-peer discussion concerning the medical necessity of the services provided to Patient 12. A peer-to-peer discussion was scheduled with a Highmark PA representative for April 6, 2022, but was ultimately rescheduled. On May 5, 2022, MC Dallas was informed by a Highmark PA representative that the claim for Patient 12 had been closed due to failure to complete a peer-to-peer discussion. MC Dallas explained that it had attempted multiple times to schedule the peer-to-peer discussion, requested that the case be reopened, and ensured that Highmark PA had the correct contact information for MC Dallas to schedule the peer-to-peer.

203.    On May 10, 2022, MC Dallas timely submitted a claim to BCBSTX for forwarding to Highmark PA for services provided to Patient 12. On May 12, 2022, MC Dallas was informed via correspondence that a peer-to-peer review had been conducted on May 11, 2022 and that Highmark PA upheld the denial of authorization of the services provided to Patient 12 on the basis that such services were purportedly not medically necessary.

204.    On May 11, 2022, Highmark PA, through BCBSTX, requested an itemized bill for the services provided to Patient 12, which MC Dallas provided on or about May 18, 2022. MC Dallas confirmed with a BCBSTX representative on July 1, 2022 that the itemized bill had been received, the claim was being reprocessed, and no additional information was needed from MC Dallas.

205.    On or about July 21, 2022, MC Dallas spoke to a BCBSTX representative who stated that the reprocessing of the claim had been done incorrectly, and it could not be escalated. On August 3, 2022, MC Dallas was informed by a representative of BCBSTX that Highmark PA had denied certain charges for Patient 12 for purported improper bundling. On August 4, 2022, the claim was reprocessed, and on August 8, 2022, it was escalated for review. On August 11, 2022, Highmark PA denied the claim for a purported lack of medical necessity. Separately, on August 26, 2022, Highmark PA remitted payment for another claim for Patient 12 related to COVID-19 testing.

206.    On August 29, 2022, MC Dallas timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed Patient 12's medical records, and requested a medical necessity review. MC Dallas contacted BCBSTX on September 7 and 23, 2022 to check on the status of the appeal and was informed on both occasions that the appeal was under review by Highmark PA. Via correspondence dated September 27, 2022, MC Dallas was informed that Highmark PA upheld its denial based on an alleged lack of medical necessity. Highmark PA's denial was confirmed by remittance dated October 6, 2022 from BCBSTX.

207.    On October 26, 2022, MC Dallas timely submitted its second-level appeal, enclosed Patient 12's medical records, and again requested a medical necessity review. On December 15, 2022, MC Dallas had not received a response to its second-level appeal and submitted a letter to BCBSTX for forwarding to Highmark PA, requesting expedited processing and payment of the claim submitted for Patient 12. On December 30, 2022, MC Dallas spoke with a BCBSTX representative who stated that Highmark PA had upheld its denial for an alleged lack of medical necessity on November 16, 2022.

208.    The denial of MC Dallas' claim for services rendered to Patient 12 on the basis of a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

209.    First, during the last seven days of her medically necessary admission, Patient 12's MRIs reflected findings consistent with leptomeningeal and perineural metastasis, requiring Patient 12 to have an Ommaya reservoir surgically placed under her scalp to administer chemotherapy treatment to her brain and spinal cord. Patient 12 received two sessions of Methotrexate treatment, and the oncology and hematology team at MC Dallas recommended that Patient 12 remain inpatient for monitoring until the Methotrexate had cleared her system. Patient 12 was in fact discharged to begin outpatient treatment after the Methotrexate had cleared. Patient 12 was also provided with medically necessary services on her first 12 days of inpatient admission.

210.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Dallas' request for the same. Further, the services rendered were medically necessary as evidenced by Patient 12's medical records.

211.    In sum, MC Dallas provided medically necessary, covered services to Patient 12 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Dallas is entitled to be paid $151,318.26 for the medically necessary, covered services it provided to Patient 12.

212.    Patient 13, Admitted and Discharged in 2022:  At the time the services were rendered, Patient 13 was a 59-year-old male who presented to the emergency department at MC North Hills due to shortness of breath and a history of lupus. X-rays and CT scans performed on Patient 13 in the emergency department revealed significant infiltrates of the chest indicative of

infection, as well as acute kidney injury. Patient 13 was positive for troponins and exhibited an ejection fraction of 20-25%, which was indicative of heart disease. Patient 13 was diagnosed with systolic heart failure and was determined to need heart catheterization but could not undergo catheterization until his renal function improved. Patient 13 was admitted as an inpatient per physician order for continued treatment of respiratory failure and acute kidney injury.

213.    During Patient 13's inpatient admission, Patient 13 began experiencing significant confusion that providers believed to be steroid psychosis. Patient 13 required a sitter until steroids could be weaned over the course of several days. Upon weaning of steroids, Patient 13's mental state improved. Once Patient 13's renal function was stable enough to undergo a cardiac catheterization, the procedure was performed.

214.    The cardiac catheterization revealed that Patient 13 had multi-vessel coronary artery disease. Patient 13 was evaluated for a CABG surgery. Patient 13's pulmonary function was also evaluated, and rheumatology was consulted for recommendations concerning his lupus. Patient 13 remained on intravenous Lasix for treatment of acute kidney injury and intravenous solumedrol for lupus pneumonitis.

215.    Once he was deemed stable, Patient 13 underwent a CABG procedure. Following the procedure, Patient 13 was transferred to the ICU for hemodynamic monitoring due to hypotension. After several days in the ICU, Patient 13's mental status, renal function, and blood pressure improved, and he was discharged after a total admission of 27 days at MC North Hills.

216.    Patient 13 presented to MC North Hills with coverage under a Highmark PA health plan. Following Patient 13's inpatient admission, MC North Hills timely provided notice to Highmark PA and sent clinical records. On May 5, 2022, Highmark PA authorized Patient 13's

inpatient admission. Ultimately, via correspondence received on or about May 16, 2022, Highmark PA authorized a total of 12 days of Patient 13's admission.

217.     On June 3, 2022, MC North Hills timely submitted a claim for services provided to Patient 13 to BCBSTX for forwarding to Highmark PA. On June 6, 2022, MC North Hills received a request from BCBSTX for an itemized bill, which MC North Hills provided to BCBSTX on June 9, 2022. On June 10, 2022, MC North Hills provided BCBSTX with Patient 13's discharge summary and updated medical records.

218.     On July 13, 2022, MC North Hills received further correspondence from BCBSTX requesting an itemized bill for the services provided to Patient 13 for purposes of a bundling audit. MC North Hills confirmed through BCBSTX's web portal on July 6 and 19, 2022 that the claim had been received and was pending processing. On July 21, 2022, MC North Hills received correspondence from BCBSTX requesting medical records for Patient 13, which were previously provided. On August 10, 2022, MC North Hills sent a letter to BCBSTX for forwarding to Highmark PA, in which MC North Hills stated the claim had been pending for 72 days and requested immediate processing.

219.     On September 12, 2022, MC North Hills spoke with a BCBSTX representative who stated that several requests had been made to Highmark PA to explain its reasoning for repeatedly requesting an itemized bill for Patient 13 and for not approving the remainder of Patient 13's inpatient admission. Via remittance on or about September 28, 2022, MC North Hills was paid $42,445.92 with the remaining $438,576.08 denied on the basis that coverage/program guidelines were not met. The remittance did not specify which coverage/program guidelines were not met.

220.     On October 6, 2022, MC North Hills requested retroactive authorization for the days of Patient 13's inpatient admission that Highmark PA had failed to authorize.

221.    On October 7, 2022, MC North Hills timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 13's medical records, and requested a medical necessity review. On October 27, 2022, MC North Hills spoke with a BCBSTX representative concerning the status of the request for retroactive authorization and was advised that no update was available. On November 8, 2022, MC North Hills was informed that Highmark PA had upheld its partial denial of the claim based on purported lack of authorization.

222.    On November 10, 2022, MC North Hills timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 13's medical records, and again requested medical necessity review. On December 1, 12, and 19, 2022, MC North Hills confirmed with a BCBSTX representative that the appeal had been received and forwarded to Highmark PA for review. On December 27, 2022, MC North Hills was informed that Highmark PA upheld its partial denial of the claim based on a purported lack of authorization.

223.    On December 29, 2022, MC North Hills spoke to a BCBSTX representative who stated that its claim was sent for reprocessing on December 5, 2022. On February 16, 2023, MC North Hills received a request for $15,664.52 on the basis that the refund was needed in order for Highmark PA to reprocess the claim. On March 31, 2023, after MC North Hills issued the refund of $15,664.52 to Highmark PA, MC North Hills received a remittance from BCBSTX recouping the $42,445.92 that Highmark PA originally paid for Patient 13's claim and remitting payment of only $26,781.40.

224.    On April 5, 2023, MC North Hills received correspondence from BCBSTX indicating that the claim for Patient 13 had been reprocessed, but no further payments were received. On February 5, 2025, MC North Hills received a letter from Highmark PA, which stated Highmark PA would purportedly pay in full for the authorized the dates of service but continued

to dispute the remaining service dates as unauthorized. To date, MC North Hills has not received further payment from Highmark PA.

225.    The denial of MC North Hills' claim for services rendered to Patient 13 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

226.    First, Highmark PA authorized 12 days of Patient 13's inpatient admission. MC North Hills timely submitted Patient 13's medical records to BCBSTX for forwarding to Highmark PA for the entirety of Patient 13's admission and requested authorization of such services, as well as retroactive authorization at a later date. Highmark PA has provided no basis for why it has refused to authorize the remainder of Patient 13's inpatient admission. To date, Highmark PA has also refused to pay in full for the dates of service it authorized. Highmark PA is prohibited by Texas law from denying payment for MC North Hills' medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the North Texas Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

227.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC North Hills' request for the same. Further, the services rendered were medically necessary as evidenced by Patient 13's medical records.

228.    Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

229.    Finally, Highmark PA has suffered no prejudice as a result of any alleged lack of authorization. MC North Hills rendered medically necessary care to Patient 13, and Highmark PA has never challenged the appropriateness of that care and, in fact, partially authorized such services.

230.    In sum, MC North Hills provided medically necessary, covered services to Patient 13 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC North Hills is entitled to be paid $123,396.57 for the medically necessary, covered services it provided to Patient 13.

231.    <u>Patient 14, Admitted and Discharged in 2022</u>: At the time the services were rendered, Patient 14 was a 68-year-old male with a medical history of alcoholism, smoking, congestive heart failure, coronary artery disease, hypertension, nonvalvular atrial fibrillation, an elevated CHADS-VASc score[16] of 5, and gastrointestinal bleeding.  Patient 14 presented to Heart Hospital for a planned procedure to undergo a Watchman left atrial appendage closure. Patient 14 tolerated the procedure well and was discharged home with instructions to hold his anti-hypertension medication because his systolic blood pressure was low.

232.    Patient 14 presented to Heart Hospital with coverage under a Highmark PA health plan. On April 27, 2022, Heart Hospital timely faxed the notice of admission to Highmark PA.

233.    Two days before the scheduled procedure, Heart Hospital attempted to confirm authorization for the procedure from Highmark PA but continued to be placed on hold. Ultimately, Heart Hospital confirmed that authorization was not required for Patient 14's procedure.

---

[16] The CHADS-VASc score is a point-based system that predicts the risk of stroke in people with atrial fibrillation.

234.    On May 11, 2022, Heart Hospital timely submitted its claim for the services it rendered to Patient 14 to BCBSTX for forwarding to Highmark PA. On July 1, 2022, Heart Hospital spoke to a BCBSTX representative who stated that Highmark PA had denied the claim based on a purported lack of prior authorization.

235.    On July 5, 2022, Heart Hospital timely submitted a first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 14's medical records, and requested a medical necessity review. On July 26, 2022, Heart Hospital spoke to a BCBSTX representative who stated that the appeal was received on July 12, 2022, that it was still in review, and that it would require 30 business days for completion. On August 2, 2022, Heart Hospital spoke to a BCBSTX representative who stated that the appeal was still under review.

236.    On August 9, 2022, Heart Hospital spoke to a BCBSTX representative who stated that Highmark PA did not accept the medical records and that BCBSTX needed to send a retroactive authorization request for CPT codes 93312 and 33340, which constituted a denial of Heart Hospital's first-level appeal.

237.    On August 10, 2022, Heart Hospital timely submitted a second-level appeal to BCBSTX for forwarding to Highmark, enclosed a copy of Patient 14's medical records, and again requested a medical necessity review.

238.    On August 31, 2022, Heart Hospital spoke with a BCBSTX representative who stated that the appeal was received on August 10, 2022 and requested 60 days for review. On September 7, 2022, Heart Hospital spoke with a BCBSTX representative who stated that the appeal should have been mailed to BCBSTX, not just submitted through the online portal. As such, on September 8, 2022, Heart Hospital timely sent the second-level appeal to BCBSTX via mail for forwarding to Highmark PA.

239.    On October 4 and October 11, 2022, Heart Hospital spoke to a BCBSTX representative who stated that the appeal was still under review. On October 18, 2022, Heart Hospital spoke to a BCBSTX representative who stated that the appeal had been forwarded to Highmark PA.

240.    On October 25 and November 1, 2022, Heart Hospital spoke to a BCBSTX representative who stated that the appeal was still under review with Highmark PA and required additional review time.

241.    Via correspondence dated November 9, 2022, Heart Hospital was informed that Highmark PA denied the appeal based on a purported lack of medical necessity, which was confirmed via separate correspondence dated November 16, 2022.

242.    The denial of Heart Hospital's claim for services rendered to Patient 14 as not medically necessary constituted a wrongful denial of benefits and should be reversed.

243.    First, Highmark PA initially denied the claim based on a lack of pre-authorization; however, Heart Hospital was informed that pre-authorization was not required. Subsequently, Highmark PA maintained its denial based on a purported lack of medical necessity. Patient 14's medical records, which were previously provided to Highmark PA, document that Patient 14 had a history of "paroxysmal atrial fibrillation" and "was a poor candidate for long-term treatment of nonvalvular AFib with oral anticoagulation given [his] history of GI bleed and bleeding risk." Accordingly, Patient 14's physician determined that a Watchman implant was medically necessary, and Patient 14 agreed to and underwent the procedure.  The fact that InterQual criteria was met corroborates the medical necessity of the inpatient admission that was ordered by Patient 14's physician in the exercise of their professional medical judgment.  The fact that Patient 14's

procedure is listed on the CMS Inpatient Only List (Addendum E), further corroborates the medical necessity of the inpatient admission.

244.    Second, the denial is improper because Highmark PA never provided a sufficiently specific clinical basis for the denial. This violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3) (requiring an adverse determination to include "the principal reasons for the adverse determination; the clinical basis for the adverse determination; [and] a description of or the source of the screening criteria used as guidelines in making the adverse determination").

245.    Third, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite Highmark PA's claim that it upheld its denial for a purported lack of medical necessity and despite MC Denton's request for the same.  Further, the services rendered were medically necessary as evidenced by Patient 14's medical records.

246.    In sum, Heart Hospital provided medically necessary, covered services to Patient 14 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, Heart Hospital is entitled to be paid $110,286.57 for the medically necessary, covered services it provided to Patient 14.

247.    Patient 15, Admitted in 2022 and Discharged in 2023: At the time services were rendered, Patient 15 was a 66-year-old male with a history of ischemic/valvular cardiomyopathy, hypertension, recent acute blood loss anemia, coronary artery disease post two coronary artery bypass grafting procedures, severe aortic stenosis status post-aortic valve repair, and left atrial appendage clip.  Patient 15 presented to Heart Hospital's emergency department via air ambulance due to multiple episodes of gastrointestinal bleeding and hematochezia.

248.    Patient 15 was admitted as an inpatient to Heart Hospital's ICU per physician order and underwent an esophagogastroduodenoscopy, which revealed a bleeding duodenal ulcer. The ulcer was injected with epinephrine and cauterized.

249.    Following the procedure, Patient 15 was monitored for 48 hours. His hemoglobin remained stable, and he tolerated a regular diet without any additional episodes of bleeding. Once medically stable, Patient 15 was discharged home on Protonix.

250.    Patient 15 presented with coverage under a Highmark PA health plan. On December 30, 2023, Heart Hospital timely submitted notice of Patient 15's admission to Highmark PA and initial clinicals to Quantum Health.

251.    On January 4, 2023, Heart Hospital spoke to a Quantum Health representative who confirmed that Quantum Health was no longer providing care coordination for Patient 15's plan. Therefore, Heart Hospital re-faxed the initial clinicals to Highmark PA on the same day. Ultimately, Heart Hospital received authorization for four days of Patient 15's admission under authorization #INT-225031/I.

252.    On January 8, 2023, Heart Hospital timely submitted its claim to BCBSTX for forwarding to Highmark PA for the services rendered to Patient 15.

253.    Via remittance dated February 4, 2023, Heart Hospital was informed that Highmark PA denied the claim on the basis that "[n]o preauthorization was obtained prior to the service."

254.    On February 17, 2023, Heart Hospital submitted a first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 15's medical records, and requested a medical necessity review. On March 10, 2023, Heart Hospital spoke to a BCBSTX representative who stated the appeal was still under review and requested 30 to 45 business days for determination.

255.    Between March 31 and June 15, 2023, Heart Hospital spoke with BCBSTX representatives at least 11 times regarding the status of the first-level appeal, all of whom stated that the appeal was still under review and additional time was needed.

256.    On June 30, 2023, more than four months after it submitted its first-level appeal, Heart Hospital spoke with a BCBSTX representative who confirmed that Highmark PA had adjudicated the first-level appeal on June 23, 2023 and upheld the denial due to lack of authorization, despite the four days of service for which Heart Hospital had received authorization from Highmark PA.

257.    On July 3, 2023, Heart Hospital timely submitted a second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 15's medical records, and requested a medical necessity review.

258.    Via correspondence dated August 7, 2023, and a conversation with a BCBSTX representative the same day, Heart Hospital was informed that the claim was actually approved, rather than denied, but that Highmark PA had applied "cost containment" purportedly for "not having appealed per the guidelines of the policy," which the representative clarified meant that penalties were imposed due to not having authorization on file. Neither Highmark PA nor BCBSTX identified to which policy it was referring in applying these cost containment penalties.

259.    The denial of Heart Hospital's claim for services rendered to Patient 15 as not authorized constituted a wrongful denial of benefits and should be reversed.

260.    First, Heart Hospital timely notified Quantum Health of Patient 15's admission and requested authorization. Once Heart Hospital was provided notice that Quantum Health was no longer providing authorization services for Patient 15's health plan, Heart Hospital notified Highmark PA of the admission and requested authorization the same day. Moreover, Highmark

PA actually authorized the inpatient admission for four days. As such, Highmark PA is prohibited by Texas law from denying payment for Heart Hospital's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the St. David's Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

261.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite Heart Hospital's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 15's medical records.

262.    Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

263.    Finally, Highmark PA has suffered no prejudice as a result of any alleged lack of authorization.  Heart Hospital rendered medically necessary care to Patient 15, and Highmark PA has never challenged the appropriateness of that care and in fact authorized such services.

264.    In sum, Heart Hospital provided medically necessary, covered services to Patient 15 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, Heart Hospital is entitled to be paid $25,177.17 for the medically necessary, covered services it provided to Patient 15.

265.    <u>Patient 16, Admitted and Discharged in 2023</u>: At the time the services were rendered, Patient 16 was an 80-year-old male with a medical history of hemorrhagic stroke status post VP shunt, Parkinson's disease, dementia, and hypertension, who presented to North Austin MC's emergency department with a chief complaint of a decline in his functioning and

neurological status. Patient 16 lived in an assisted living facility, and for several days leading up to his admission, he had no longer been able to transfer or eat by himself.

266.    During the emergency department evaluation, Patient 16 was unable to answer the physician's questions. He was subsequently admitted as an inpatient, per physician order, to North Austin MC for further evaluation.

267.    Further evaluation revealed acute cognitive decline and dyspnea. Patient 16 received DuoNeb treatments twice with improvement in his wheezing. He also received antibiotics for pneumonia and right, second toe cellulitis.  Once Patient 16's condition sufficiently improved, Patient 16 was discharged to a skilled nursing facility.

268.    Patient 16 presented to North Austin MC's emergency department with Medicare Part A and B coverage. On Patient 16's last day of admission, North Austin MC spoke with Patient 16's wife, who clarified that Highmark PA was Patient 16's primary insurer. Therefore, North Austin MC timely submitted notice of Patient 16's admission to Highmark PA the same day. Highmark PA did not respond to the first notice of admission. As such, a second notice of admission was sent on April 3, 2023. In response to the second notice of admission, Highmark PA stated that the services were already completed, and therefore, they could not issue authorization.

269.    On April 8, 2023, North Austin MC timely submitted its claim to BCBSTX for forwarding to Highmark PA for the services rendered to Patient 16.

270.    Via remittance dated May 3, 2023, North Austin MC was informed that Highmark PA denied the claim in full on the basis that "coverage/program guidelines were not met." The remittance did not specify which coverage/program guidelines were not met.

271.    On May 9, 2023, North Austin MC timely submitted a first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 16's medical records, and

requested a medical necessity review. On June 2, 2023, North Austin MC spoke to a BCBSTX representative who stated that BCBSTX was unable to locate the appeal. North Austin MC planned to resend if all documents were not accounted for by the next follow-up call.

272.    On June 8, 2023, North Austin MC spoke to a BCBSTX representative who stated that they had received the appeal and that it was under review. On June 15, 2023, North Austin MC spoke to a BCBSTX representative who stated the appeal was still under review, and the estimated completion date was 30 to 60 business days from date of receipt. On July 10 and July 17, 2023, North Austin MC called BCBSTX, and both times, the BCBSTX representative advised that additional time was needed to process the appeal.

273.    On July 24, 2023, North Austin MC spoke to a BCBSTX representative who stated that BCBSTX had not forwarded the first-level appeal to Highmark PA but noted that BCBSTX was going to send the appeal to Highmark PA that day. The BCBSTX representative also asked for an additional 30 to 45 business days for processing.

274.    On August 8, 2023, North Austin MC spoke to a BCBSTX representative who stated the appeal was still under review and had been forwarded to Highmark PA. On August 15, 2023, North Austin MC spoke to a BCBSTX representative who stated that the review required additional time.

275.    On August 24, 2023, North Austin MC spoke to a BCBSTX representative who stated Highmark PA had not responded to BCBSTX's July 24, 2023 inquiry. On August 29, 2023, BCBSTX confirmed the appeal was still under review by Highmark PA. A BCBSTX representative provided North Austin MC with the same update on September 5, 2023.

276.    On September 12, 2023, North Austin MC spoke to a BCBSTX representative who stated that BCBSTX would follow up with Highmark PA by sending an inquiry for a response. On

September 19, 2023, BCBSTX confirmed it had sent the inquiry to Highmark PA on September 12, 2023. A week later, on September 26, 2023, North Austin MC spoke to a BCBSTX representative who stated that the appeal documents had been uploaded to their system in two "bundles," and only one bundle was submitted to Highmark PA on July 24, 2023. The BCBSTX representative further confirmed that the second bundle was submitted to Highmark PA that same day.

277.    On September 28, 2023, North Austin MC received correspondence from Highmark PA, which provided notice that North Austin MC's request for inpatient hospitalization for Patient 16 had been approved for eight days of service with Reference # (CASE-17273511) (REQ-22118358).

278.    On October 3, 2023, North Austin MC spoke to a BCBSTX representative who stated that more time was required for review by Highmark PA.

279.    On October 18, 2023, more than five months after it submitted its first-level appeal, North Austin MC spoke with a BCBSTX representative who confirmed that Highmark PA had adjudicated the first-level appeal on October 12, 2023 and upheld the initial denial due to a purported lack of preauthorization, despite the September 28 notice North Austin MC received from Highmark PA authorizing eight days of inpatient hospitalization.

280.    On October 18, 2023, North Austin MC timely submitted a second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 16's medical records, and again requested a medical necessity review.

281.    On November 8 and November 17, 2023, North Austin MC spoke to BCBSTX representatives who confirmed that BCBSTX received the second-level appeal on October 30, 2023 and that additional time was needed to complete the review. North Austin MC continued to

follow up with BCBSTX approximately three more times between November 17, 2023 and December 5, 2023. Each time, the BCBSTX representative stated additional time was needed for review.

282.    On December 12, 2023, North Austin MC spoke with a BCBSTX representative who stated that BCBSTX was going to send Highmark PA the September 28 correspondence retroactively authorizing Patient 16's inpatient admission. Throughout the remainder of December 2023 and January 2024, North Austin MC continued to follow up with BCBSTX, and all correspondence continued to indicate that more time was needed for Highmark PA to complete the review.

283.    On January 26, 2024, North Austin MC spoke with a BCBSTX representative who stated that although BCBSTX sent an inquiry to Highmark PA about the appeal on December 12, 2023, it did not include the medical records. The BCBSTX representative stated that BCBSTX was going to forward the medical records to Highmark PA.

284.    On February 1, 2024, North Austin MC spoke with a BCBSTX representative who confirmed that the second-level appeal had been adjudicated by Highmark PA on January 31, 2024 and that the denial was upheld due to alleged lack of preauthorization.

285.    The denial of North Austin MC's claim for services rendered to Patient 16 as purportedly not authorized constituted a wrongful denial of benefits and should be reversed.

286.    First, North Austin MC timely notified Highmark PA the same day it learned that Highmark PA was the primary payor. As stated above, Patient 16 initially presented to North Austin MC's emergency department with Medicare Part A and B as his primary insurance, and it was not disclosed to North Austin MC that Highmark PA was the primary payor until his last day of admission. Moreover, Highmark PA actually authorized the inpatient admission for eight days

via correspondence dated September 27, 2023. As such, Highmark PA is prohibited by Texas law from denying payment for North Austin's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the St. David's Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

287.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite North Austin MC's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 16's medical records.

288.    Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

289.    Finally, Highmark PA has suffered no prejudice as a result of any alleged lack of authorization.  North Austin MC rendered medically necessary care to Patient 16, and Highmark PA has never challenged the appropriateness of that care and in fact partially authorized such services.

290.    In sum, North Austin MC provided medically necessary, covered services to Patient 16 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, North Austin MC is entitled to be paid $25,950.64 for the medically necessary, covered services it provided to Patient 16.

291.    <u>Patient 17, Admitted and Discharged in 2023</u>: At the time the services were rendered, Patient 17 was a 68-year-old male with a medical history of chronic obstructive

pulmonary disease and lung cancer who presented to MC Denton's emergency department with complaints of aggressive shortness of breath over the past weeks.

292.    A chest x-ray showed Patient 17 had acute hypoxic respiratory failure with bilateral basilar opacities. Patient 17 was admitted to MC Denton as an inpatient per physician order. Patient 17 was treated with steroids and antibiotics, which escalated to intravenous Cefepime and Vancomycin for broad spectrum coverage because this was his second inpatient admission for pneumonia in the past two months. Patient 17 also received a Cardizem drip for atrial fibrillation and underwent a cardioversion. After Patient 17 was stabilized, he was discharged home.

293.    Patient 17 presented to MC Denton late in the night with coverage under Highmark PA. The day following Patient 17's admission, MC Denton timely notified Highmark PA of the admission and faxed Patient 17's clinicals. On May 23, 2023, MC Denton faxed updated clinicals to Highmark PA. On May 26, 2023, MC Denton faxed Patient 17's discharge summary to Highmark PA.

294.    On May 31, 2023, Highmark PA instructed MC Denton to send the authorization request to its agent, Quantum Health. MC Denton faxed the notice of admission and clinicals to Quantum Health the same day. On June 1, 2023, MC Denton spoke to a Quantum Health representative who stated that authorization for Patient 17's inpatient admission was pending. On June 2, 2023, MC Denton again faxed clinicals to Quantum Health.

295.    On June 15, 2023, MC Denton spoke to a Quantum Health representative who stated that the retroactive review determination was due by July 2, 2023. On June 16, 2023, MC Denton spoke to a Quantum Health representative who stated authorization was still pending.

296.    On June 20, 2023, MC Denton timely submitted its claim to BCBSTX for forwarding to Highmark PA for the services it rendered to Patient 17.

297.    Via remittance date June 28, 2023, MC Denton was informed that Highmark PA denied the claim on the basis that "[p]recertification/authorization/notification" was purportedly absent.

298.    On June 30, 2023, MC Denton timely submitted a first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 17's medical records, and requested a medical necessity review. On July 20, 2023, MC Denton spoke to a BCBSTX representative who stated that BCBSTX received the first-level appeal on July 10, 2023 and requested 30 to 60 days to complete review of the appeal. Between July 27, 2023 and October 4, 2023, MC Denton spoke to BCBSTX representatives at least nine times, all of whom stated that the appeal was still under review by Highmark PA and additional time was needed.

299.    On October 11, 2023, more than three months after it submitted its first-level appeal, MC Denton spoke to a BCBSTX representative who stated that as of October 2, 2023, Highmark PA upheld the denial of the claim because authorization was not timely obtained.

300.    On October 12, 2023, MC Denton timely submitted a second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 17's medical records, and again requested a medical necessity review.

301.    On November 2, 2023, MC Denton spoke to a BCBSTX representative who stated that BCBSTX received the second-level appeal on October 24, 2023, and the estimated completion date was 60 days from the date of receipt.

302.    In November and December of 2023, MC Denton spoke to representatives of BCBSTX on four separate occasions, all of whom stated that the appeal was still under review and additional time was required. On December 27, 2023, MC Denton spoke to a BCBSTX representative who stated the appeal was under review by Highmark PA as of December 18, 2023.

303.    Between January 4 and February 19, 2024, MC Denton spoke to BCBSTX representatives at least seven times, all of whom stated that the second-level appeal was still under review with Highmark PA and that additional time was needed.

304.    On February 27, 2024, MC Denton spoke to a BCBSTX representative who stated that as of February 18, 2024, Highmark PA upheld the denial of the claim because no valid authorization was issued.

305.    The denial of MC Denton's claim for services rendered to Patient 17 as purportedly not authorized constituted a wrongful denial of benefits and should be reversed.

306.    First, MC Denton timely notified Highmark PA of Patient 17's late-night admission. Highmark PA took 13 days to notify MC Denton that Quantum Health managed authorization requests. The same day, MC Denton faxed Patient 17's notice of admission and clinicals to Quantum Health for authorization. To date, MC Denton has not received a response to its request for authorization. Highmark PA cannot maintain its denial on the basis of a lack of authorization when it refused to respond to a timely request for authorization.

307.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Denton's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 17's medical records.

308.    Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

309.    Finally, Highmark PA has suffered no prejudice due to any lack of authorization. MC Denton rendered medically necessary care to Patient 17, and Highmark PA has never challenged the appropriateness of that care.

310.    In sum, MC Denton provided medically necessary, covered services to Patient 17 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Denton is entitled to be paid $26,799.00 for the medically necessary, covered services it provided to Patient 17.

311.    <u>Patient 18, Admitted and Discharged in 2024</u>: At the time services were rendered, Patient 18 was a 58-year-old male with history of hypertension, hyperlipidemia, and type 2 diabetes mellitus, who presented to MC Denton's emergency department via an urgent care referral with symptoms of deep vein thrombosis in his right lower extremity. The day prior to presentation at MC Denton, Patient 18 fell at work on his right knee. After the fall, he experienced right knee pain and worsening swelling.

312.    Patient 18's initial workup revealed asymptomatic hypertensive urgency, anemia, and severe renal insufficiency of unknown length. Due to the severity and complexity of Patient 18's symptoms, Patient 18 was admitted as an inpatient at MC Denton per physician order for continued evaluation and treatment. Patient 18 was diagnosed with a posterior cruciate ligament injury and right avulsion facture to the posterior tibial plateau. Patient 18 participated in physical and occupational therapy during his admission.

313.    Patient 18's urine studies and renal ultrasound were negative for acute findings. Nephrology was consulted, and Patient 18 required a blood transfusion two days into his admission with a continued anemia work-up and treatment. A renal biopsy revealed significant diabetic glomerulosclerosis. Vascular surgery had to be consulted to place access (perma-catheter and

fistula) for hemodialysis. Patient 18 required an outpatient hemodialysis chair prior to discharge. After tolerating the initiation of hemodialysis and optimizing other comorbidities, Patient 18 was discharged home in stable condition.

314.    Patient 18 presented at MC Denton with coverage under a Highmark PA health plan. MC Denton timely notified Highmark PA of Patient 18's admission and requested authorization. On April 2, 2024, MC Denton received correspondence from Highmark PA that authorization had been issued under AUTH-3009309. On April 4, 2024, MC Denton received correspondence from Highmark PA, which provided notice that MC Denton's request for inpatient hospitalization for Patient 18 had been approved for 10 days of service with Reference # INIT-2462497.

315.    On April 14, 2024, MC Denton timely submitted its claim for the services rendered to Patient 18 to BCBSTX for forwarding to Highmark PA. Via remittance dated April 19, 2024, MC Denton was informed that Highmark PA denied the claim in full on the basis that "[c]overage/program guidelines were not met." The remittance did not specify which coverage/program guidelines were not met.

316.    On May 17, 2024, MC Denton timely submitted a first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 18's medical records, and requested a medical necessity review. On May 29, 2024, MC Denton uploaded the first-level appeal with Patient 18's medical records to the online portal.

317.    On June 19, 2024, via the online portal, BCBSTX confirmed receipt of the first-level appeal and Patient 18's medical record and requested 30 to 45 days for review. On June 27, 2024, MC Denton spoke to a BCBSTX representative who confirmed the appeal was sent to Highmark PA for review and requested an additional 30 days for review.

318.    Via remittance dated July 17, 2024, MC Denton was informed that Highmark PA denied the claim in full on the basis that "[p]recertification/authorization/notification" was purportedly absent.

319.    On July 30, 2024, MC Denton spoke to a BCBSTX representative who stated that the appeal was still under review and BCBSTX would follow up with Highmark PA.

320.    On July 31, 2024, more than two months after MC Denton submitted its first-level appeal, via the online portal, BCBSTX confirmed that Highmark PA upheld the denial due to a purported lack of authorization.

321.    On August 6, 2024, MC Denton timely submitted a second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 18's medical records, and again requested a medical necessity review.

322.    Via correspondence dated August 9, 2024, BCBSTX informed MC Denton that Highmark PA upheld its denial, stating "[Highmark PA] has advised that retro authorization was approved, and the claim was adjusted already under the 01. However, [Highmark PA] is applying a penalty due to the authorization not being obtained within the required time frame."

323.    The denial of MC Denton's claim for services rendered to Patient 18 as not purportedly authorized constituted a wrongful denial of benefits and should be reversed.

324.    First, MC Denton timely notified Highmark PA of Patient 18's admission. Moreover, Highmark PA actually authorized the inpatient admission for 10 days via correspondence dated April 4, 2024. As such, Highmark PA is prohibited by Texas law from denying payment for MC Denton's medically necessary services under these circumstances. *See* Tex. Ins. Code. Section 1301.135(f). Further, under the terms of the North Texas Agreement,

authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

325.     Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Denton's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 18's medical records.

326.     Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

327.     Finally, Highmark PA has suffered no prejudice as a result of any alleged lack of authorization. MC Denton rendered medically necessary care to Patient 18, and Highmark PA has never challenged the appropriateness of that care and in fact authorized such services.

328.     In sum, MC Denton provided medically necessary, covered services to Patient 18 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Denton is entitled to be paid $34,327.21 for the medically necessary, covered services it provided to Patient 18.

329.     Patient 19, Admitted and Discharged in 2022: At the time the services were rendered, Patient 19 was a 67-year-old male with a medical history of nonvalvular atrial fibrillation with rapid ventricular response, congestive heart failure, hypertension, hyperlipidemia, and tachycardia induced cardiomyopathy who presented to St. David's MC for a planned procedure and underwent Watchman device placement and pulmonary vein antrum isolation ablation surgery for atrial fibrillation.

330.    Per physician order, Patient 19 was admitted as an inpatient with telemetry postoperatively and received post-operation care and monitoring. The next day, Patient 19 was medically cleared for discharge and was discharged home in stable condition.

331.    On July 15, 2022, prior to the procedure, Highmark NY denied coverage for the proposed services because, according to Highmark NY, performing this procedure as an inpatient procedure was not medically necessary.

332.    On July 23, 2022, St. David's MC attempted to transmit Patient 19's notice of admission via fax and electronically to Highmark NY but could not transmit the documentation because Patient 19's subscriber prefix did not exist. On the same day, St. David's MC spoke to a Highmark NY representative who stated that the admission was denied because it did not meet medical necessity requirements and noted that St. David's MC could submit an appeal.

333.    On August 4, 2022, St. David's MC timely submitted its claim for the services rendered to Patient 19 to BCBSTX for forwarding to Highmark NY.

334.    On August 22, 2022, BCBSTX requested an itemized bill from St. David's MC for review. On September 1, 2022, St. David's MC submitted Patient 19's medical records to BCBSTX via the online portal.

335.    Via remittance dated October 12, 2022, St. David's MC was informed that Highmark NY denied the claim in full on the basis that "[t]hese [were] non-covered services because it [was] not deemed a 'medical necessity' by the payer."

336.    On October 12, 2022, St. David's MC timely submitted a first-level appeal to BCBSTX for forwarding to Highmark NY, enclosed a copy of Patient 19's medical records, and requested a medical necessity review. On November 2, 2022, St. David's MC spoke to a BCBSTX representative who stated that BCBSTX received the appeal on October 20, 2022, that BCBSTX

had forwarded the appeal to Highmark NY on October 21, 2022, and that BCBSTX was requesting 30 days for review.

337.    Throughout November 2022, Saint David's MC spoke to a BCBSTX representative no fewer than three additional times, and each time, BCBSTX stated that additional time was needed for review.

338.    On December 5, 2022, St. David's MC received correspondence from BCBSTX that stated the appeal was still under review and that BCBSTX would notify St. David's MC when a decision on the appeal was rendered.

339.    On December 8, 2022, St. David's MC sent an attorney demand letter to BCBSTX requesting a determination on the appeal.

340.    On December 12, 2022, St. David's MC spoke to a BCBSTX representative who stated that Highmark NY informed BCBSTX that Patient 19 appealed the claim on October 27, 2022. The BCBSTX representative further stated the information had been added to Patient 19's appeal review, and the response would be made to Patient 19 directly.

341.    On December 19, 2022, St. David's MC located correspondence from Highmark NY dated November 22, 2022, which upheld the original denial of the claim due to an alleged lack of medical necessity. Highmark NY stated, "[t]his is our final adverse determination."

342.    The denial of St. David's MC's claim for services rendered to Patient 19 as purportedly not medically necessary constituted a wrongful denial of benefits and should be reversed.

343.    First, Patient 19's physician exercised their professional medical judgment in conducting the procedure, based on Patient 19's clinical indicators. Patient 19's medical records, which were previously provided to Highmark NY, document that Patient 19 had a history of

nonvalvular atrial fibrillation with rapid ventricular response, congestive heart failure, hypertension, hyperlipidemia, and tachycardia induced cardiomyopathy. Accordingly, Patient 19's physician determined that a Watchman implant was medically necessary, and Patient 19 agreed to and underwent the procedure.

344.    The denial is also improper because Highmark NY never provided a sufficiently specific clinical basis for the denial. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).) This denial similarly violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3) (requiring an adverse determination to include "the principal reasons for the adverse determination; the clinical basis for the adverse determination; [and] a description of or the source of the screening criteria used as guidelines in making the adverse determination").

345.    The fact that InterQual criteria was met corroborates the medical necessity of the inpatient admission that was ordered by Patient 19's physician in the exercise of their professional medical judgment.  The fact that Patient 19's procedure is listed on the CMS Inpatient Only List (Addendum E), further corroborates the medical necessity of the inpatient admission.

346.    In sum, St. David's MC provided medically necessary, covered services to Patient 19 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, St. David's MC is entitled to be paid $105,294.26 for the medically necessary, covered services it provided to Patient 19.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 85**

347.    Patient 20, Admitted and Discharged in 2022: At the time the services were rendered, Patient 20 was a 49-year-old female who presented to MC Frisco for elective outpatient robot-assisted laparoscopic Roux-en-Y gastric bypass and liver biopsy with a planned short stay post-operatively for observation. Patient 20 had a history of hepatic steatosis, morbid obesity, diabetes, hypertension, and end-stage renal failure which required her to undergo peritoneal dialysis for the two years prior to presenting to MC Frisco.

348.    In anticipation of her scheduled bypass, Patient 20 transitioned from peritoneal dialysis to hemodialysis for the two weeks prior to her procedure because, post-operatively, she would need to be on hemodialysis. Patient 20 was cleared for surgery pre-operatively by a cardiologist and underwent a normal nuclear stress test and pre-operative labs the day prior to surgery.

349.    Patient 20 underwent the robot-assisted laparoscopic gastric bypass and laparoscopic liver biopsy without complication. Following her surgery, Patient 20 was placed under observation at MC Frisco due to an elevated risk for post-operative complications. She was transferred to MC Plano for her first round of hemodialysis on post-operative day one, as MC Frisco did not have the capability to provide her with hemodialysis services, and Patient 20 was subsequently transported back to MC Frisco. An upper gastrointestinal series performed showed no evidence of any leaks or obstructions to her esophagus or stomach.

350.    On post-operative day two, Patient 20 was admitted as an inpatient per physician order by general surgery for continued monitoring of renal function and bariatric dietitian evaluation. InterQual criteria for inpatient admission was met. She was transferred to MC Plano on post-operative day two for a second round of hemodialysis and then transported back to MC Frisco. Three days after the operation, Patient 20 was discharged in stable condition.

351.    Patient 20 presented to MC Frisco with coverage under a Highmark PA health plan. MC Frisco timely notified Highmark PA of Patient 20's inpatient admission on November 20, 2022 and faxed her medical records. After receiving no response to its request for authorization, on November 30, 2022, MC Frisco spoke with a representative of Highmark PA who stated that Highmark PA had cancelled the authorization allegedly due to submission of incomplete information. The next day, December 1, 2022, MC Frisco resent the request for authorization to Highmark PA with Patient 20's medical records. On December 5, December 6, December 7, and December 8, 2022, MC Frisco attempted to contact Highmark PA to follow up on its authorization request but was unable to connect with a representative. On December 8, 2022, MC Frisco sent a letter to Highmark PA regarding its lack of response, along with Patient 20's medical records.

352.    On or about December 9, 2022, MC Frisco timely submitted its claim for reimbursement for the services provided to Patient 20 to BCBSTX for forwarding to Highmark PA. On December 11, 2022, on behalf of Highmark PA, BCBSTX acknowledged receipt of the claim for processing.

353.    Via remittance dated December 13, 2022, BCBSTX, on behalf of Highmark PA, requested Patient 20's medical records. On December 23, 2022, MC Frisco was notified that the claim was denied because Highmark PA alleged that it had not yet received the medical records, despite MC Frisco sending them multiple times. On January 3, 2023, MC Frisco re-sent the medical records for a third time to BCBSTX for forwarding to Highmark PA.

354.    Via remittance on January 26, 2022, MC Frisco was advised that upon further review of the claim, an adjustment was warranted but to allow additional time for the claim to be processed. Via remittance on March 1, 2023, MC Frisco was informed the claim was still under review.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 87**

355.    On March 24, 2023, MC Frisco spoke with a representative of BCBSTX who stated that the claim had been reprocessed and forwarded to Highmark PA on March 20, 2023. MC Frisco spoke with a representative of BCBSTX on April 25, 2023 who stated that Highmark PA had requested additional time for review. Ultimately, on May 11, 2023, MC Frisco was informed that Highmark PA denied the claim for Patient 20's inpatient services in full on the basis that "coverage/program guidelines were not met." The remittance did not state which specific coverage or program guidelines were not allegedly met.

356.    On or about July 6, 2023, MC Frisco timely submitted its first-level of appeal via reconsideration request to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 20's medical records, and requested a medical necessity review.

357.    On August 28, 2023, MC Frisco spoke with a BCBSTX representative who stated that the appeal was under review and to allow 30-45 days to conduct such review. On September 5, 2023, during a call with a BCBSTX representative, MC Frisco learned that Highmark PA had not requested the medical records yet, and therefore, had not reviewed the appeal. Despite multiple calls inquiring about the status of the appeal, it was not until October 3, 2023 that MC Frisco learned from a call with a BCBSTX representative that Highmark PA had been forwarded the appeal on September 27, 2023 and that review would take another 30 to 45 days.

358.    Between October 10, 2023 and November 7, 2023, MC Frisco called BCBSTX to obtain information as to the status of the appeal on five separate occasions and was told every time that additional time was needed. A BCBSTX representative told MC Frisco on a call on November 14, 2023 that BCBSTX had inquired with Highmark PA concerning the status of the appeal on October 31, 2023, but Highmark PA had yet to respond. MC Frisco called BCBSTX seven more times between November 21, 2023, and January 23, 2024 and was met with the same response:

additional time for review was needed. Finally, via correspondence on January 24, 2024, MC Frisco was informed that Highmark PA had upheld its denial on the basis that the services were purportedly not authorized.

359.    On or about February 7, 2024, MC Frisco timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 20's medical records, and again requested a medical necessity review. The appeal also noted that MC Frisco had attempted to obtain inpatient authorization, but the request was denied for lack of information, even though MC Frisco faxed Patient 20's clinicals multiple times.

360.    On February 29, 2023, MC Frisco spoke with a BCBSTX representative who confirmed receipt of the appeal and stated that it was forwarded to Highmark PA for review. MC Frisco was advised to allow 30-60 days for a response as to the second-level appeal.

361.    On March 15, 2024, MC Frisco spoke with a BCBSTX representative who stated the second-level appeal was denied on March 13, 2024 because authorization was allegedly requested too late. Via correspondence dated March 15, 2024, BCBSTX stated that Highmark PA had applied a 100% provider sanction because the authorization was allegedly requested late. Highmark PA alleged that because the patient was not admitted from the emergency room, MC Frisco had to notify Highmark PA of the inpatient admission either prior to or on the date of admission.

362.    The denial of MC Frisco's claim for services rendered to Patient 20 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

363.    First, MC Frisco timely notified Highmark PA of Patient 20's inpatient admission the day she was admitted. Highmark PA did not act on this authorization request despite receiving

Patient 20's clinicals. Highmark PA cannot maintain its denial on the basis of a lack of authorization when it refused to respond to a timely request for authorization.

364.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Frisco's request for the same. The services rendered were medically necessary as evidenced by Patient 20's medical records. The fact that InterQual criteria was met corroborates the medical necessity of the inpatient admission that was ordered by Patient 20's physician in the exercise of their professional medical judgment. The fact that Patient 20's procedure is listed on the CMS Inpatient Only List (Addendum E), further corroborates the medical necessity of the inpatient admission.

365.    Finally, Highmark PA has suffered no prejudice as a result of any alleged lack of authorization. MC Frisco rendered medically necessary care to Patient 20, and Highmark PA has never challenged the appropriateness of that care.

366.    In sum, MC Frisco provided medically necessary, covered services to Patient 20 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Frisco is entitled to be paid $60,906.27 for the medically necessary, covered services it provided to Patient 20.

367.    Patient 21, Admitted and Discharged in 2022: At the time the services were rendered, Patient 21 was a 61-year-old male who presented to MC Plano as a transfer/direct admit for a CABG procedure. At the transferring hospital, Patient 21 was found to have a non-ST segment elevation myocardial infarction and was diagnosed with multivessel coronary artery disease and ejection fraction of 35-40%. The CABG was performed without complication. Post-operatively, Patient 21 was admitted to the ICU, intubated, and placed on intravenous vasoactive infusions. Patient 21 was extubated once stable.

368.    On post-operative day six, Patient 21 had a sudden onset of stroke symptoms and was discovered via angiograph to have an M2 occlusion and a right middle cerebral artery distribution infarct with hemorrhage and a midline shift. He was intubated due to respiratory depression and treated with hypertonic saline and Lasix. He failed three spontaneous breathing trials and was intubated for approximately seven days.

369.    On post-operative day 15, Patient 21 had a tracheostomy and percutaneous endoscopic gastrostomy. He was extubated on post-operative day 16 and was stable on nasal cannula throughout the day and on BiPAP at night.

370.    While at MC Plano, Patient 21 developed pneumonia and was placed on intravenous antibiotics until post-operative day 26. The same day, he had sudden onset of stroke symptoms again and was moved back to the ICU for close neurological monitoring. He required a left sided thoracentesis with interventional radiology that drained almost one liter of fluid due to a significant pleural effusion. While at MC Plano, Patient 21 participated in physical therapy, occupational therapy, and speech therapy. After 35 days at MC Plano, Patient 21 was deemed medically stable and discharged to an inpatient rehabilitation facility.

371.    Patient 21 presented to MC Plano with coverage under a Highmark PA health plan. MC Plano timely provided notice of Patient 21's admission to Highmark PA on the day he was admitted and sent his clinicals. The following day, MC Plano received a voicemail from Highmark PA's agent, Quantum Health, requesting copies of Patient 21's clinicals, which MC Plano provided. On November 22, 2022, Quantum Health acknowledged receipt of Patient 21's notice of admission and clinicals. MC Plano faxed updated clinicals to Quantum Health throughout Patient 21's admission.

372.    On December 21, 2022, MC Plano spoke with a Quantum Health representative who stated Patient 21's admission was authorized for the first 28 days but was denied for the last seven days, purportedly on the basis that the last seven days of care could have been provided at a setting of lower acuity. On December 29, 2022, MC Plano spoke with a Quantum Health representative who stated that authorization for the last seven days remained denied and identified the Quantum Health representative to contact to arrange a peer-to-peer review. MC Plano made three attempts to reach said representative to arrange the peer-to-peer review and was unsuccessful each time.

373.    On December 29, 2022, MC Plano timely submitted its claim for reimbursement for the services rendered to Patient 21 to BCBSTX for forwarding to Highmark PA. On February 24, 2023, Highmark PA made partial payment on the claim in the amount of $118,440.69, denying the remainder of the claim on the basis that "coverage/program guidelines were not met."  The remittance did not specify which coverage/program guidelines were not met.

374.    On March 6, 2023, MC Plano spoke with a Quantum Health representative and submitted a request for retroactive authorization. Via correspondence on March 23, 2023, MC Plano was notified that the retroactive authorization request had been deemed withdrawn by Highmark PA.

375.    On or about March 23, 2023, MC Plano timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 21's medical records, and requested a medical necessity review. On May 1, 2023, MC Plano spoke to a BCBSTX representative who stated that Highmark PA upheld its denial based on a purported lack of authorization.

376.    On May 3, 2023, MC Plano submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 21's medical records, and again requested a medical necessity review.

377.    On June 14, 2023, MC Plano spoke with a BCBSTX representative who stated the second-level appeal was received on May 9, 2023 but could not be forwarded to Highmark PA for review because an incorrect claim number was listed on the appeal.

378.    On July 13, 2023, MC Plano re-submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, with the correct claim number listed. On August 7, 2023, MC Plano spoke with a BCBSTX representative who confirmed receipt of the second-level appeal via the online portal but advised that the appeal also needed to be submitted by mail. MC Plano mailed the appeal to BCBSTX the same day. On August 28, 2023, MC Plano spoke with a BCBSTX representative who confirmed receipt of the mailed copy of the second-level appeal but stated that it had the incorrect claim number listed. The next day, MC Plano re-submitted its second-level appeal via mail with the correct claim number.

379.    Via remittance on December 21, 2023, MC Plano was informed that Highmark PA upheld its denial based on a purported lack of authorization. Via correspondence received on January 22, 2024, MC Plano was informed that, per Patient 21's health plan, authorization was required for the denied services.

380.    The denial of MC Plano's claim for services rendered to Patient 21 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

381.    First, MC Plano did receive authorization for 29 days of Patient 21's admission, but Highmark PA has, nonetheless, refused to pay for those authorized days in full. Highmark PA is prohibited by Texas law from denying payment for MC Plano's medically necessary services

under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the North Texas Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

382.     Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Plano's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 21's medical records.

383.     Finally, Highmark PA suffered no prejudice due to any alleged lack of authorization because MC Dallas rendered medically necessary care to Highmark PA's member, and Highmark PA has never challenged the appropriateness of the care provided to Patient 21 and, in fact, partially authorized such services.

384.     In sum, MC Dallas provided medically necessary, covered services to Patient 21 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Plano is entitled to be paid $96,171.84 for the medically necessary, covered services it provided to Patient 21.

385.     Patient 22, Admitted and Discharged in 2023: At the time the services were rendered, Patient 22 was a 9-month-old male who presented to MC Dallas' emergency department after three days of cough, congestion, post-tussive emesis, and fevers, with his symptoms dramatically worsened on day three when intercostal and subcostal retractions with nasal flaring were observed by his mother. Labs and imaging were obtained and a chest x-ray showed pneumonia. Initiation of high flow nasal cannula was started, and albuterol and antibiotics were given. Patient 22 was admitted to the pediatric intensive care unit ("PICU") per physician order for further treatment of bronchiolitis and pneumonia.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 94**

386.     Patient 22 remained in the PICU for three days where he required approximately fifteen liters of high flow oxygen via nasal cannula, albuterol, IV fluids, Protonix, nebulizers and steroids. He was initially started on Ceftriaxone to treat presumed bacterial superimposed pneumonia but later switched to oral Cefdinir on the third day of the admission.

387.     On the fourth day of his admission, Patient 22 was transferred to the pediatric floor after being weaned to one-liter oxygen via nasal cannula, where he was further weaned to room air. After four days in the hospital, Patient 22 was discharged home in stable condition.

388.     Patient 22 presented to MC Dallas with coverage under a Highmark PA health plan. MC Dallas timely notified Highmark PA of Patient 22's admission on March 13, 2023 and faxed his clinicals at the same time. However, via correspondence dated March 13, 2023, Highmark PA denied authorization on the basis that the services were not eligible for coverage. On March 20, 2023, MC Dallas spoke with a Highmark PA representative who advised to re-fax the request because there was no authorization on file or notification of admission. On March 21, 2023, Highmark PA informed MC Dallas that the authorization request had been closed because Patient 22 purportedly did not have coverage.

389.     On or about March 23, 2023, MC Dallas timely submitted its claim for the services rendered to Patient 22 to BCBSTX for forwarding to Highmark PA. Via remittance on April 13, 2023, MC Dallas was informed that the claim was denied in full on March 28, 2023 on the basis that "coverage/program guidelines were not met." The remittance did not specify what coverage or program guidelines were not met.

390.     On or about April 25, 2023, MC Dallas timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 22's medical records, and requested a medical necessity review. On May 1, 2023, MC Dallas spoke with a BCBSTX

representative who confirmed receipt of the appeal.

391.    Between May 18, 2023, and June 7, 2023, MC Dallas called BCBSTX no fewer than three times regarding the status of the appeal and each time was told to allow more time. On June 29, 2023, MC Dallas spoke with a BCBSTX representative who stated the appeal had not yet been forwarded to Highmark PA for review. MC Dallas was notified via correspondence on July 6, 2023 that Highmark PA had been forwarded the appeal and to allow additional time for review.

392.    On July 24, 2023, MC Dallas spoke with a BCBSTX representative who stated that Patient 22's medical records were forwarded to Highmark PA but that more time was needed for review. MC Dallas called BCBSTX no fewer than six times between July 31, 2023 and October 17, 2023 and was told each time to allow additional time for review.

393.    Finally, via correspondence dated October 23, 2023, MC Dallas was informed that Highmark PA had approved its request for retroactive authorization of Patient 22's inpatient admission. On subsequent calls and communications with BCBSTX representatives in November and December of 2023, MC Dallas was notified that additional time would be needed to process the adjustment.

394.    Via correspondence received on December 18, 2023, MC Dallas was notified that the claim denial had been overturned. On December 21, 2023, however, MC Dallas was notified via correspondence that Highmark PA had actually upheld its denial of the claim for "precertification/authorization/notification absent" and applied a 100% provider sanction because authorization had purportedly been obtained too late.

395.    On or about January 3, 2024, MC Dallas timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 22's medical records, and again requested a medical necessity review. On January 30, 2024, MC Dallas spoke with a

BCBSTX representative who confirmed receipt of the appeal but stated the appeal had not yet been forwarded to Highmark PA.

396.    Between February 1, 2024 and March 5, 2024, MC Dallas called BCBSTX no fewer than six times and was told to allow more time for review.

397.    On March 11, 2024, MC Dallas spoke with a BCBSTX representative who stated that Highmark PA had authorized the dates of service, but because authorization was not completed within 72 hours of service, no payment would be made. Via correspondence dated March 27, 2024, BCBSTX stated, on behalf of Highmark PA, that the claim denial was based on the member's benefit coverage and to contact Highmark PA if they disagreed with the decision.

398.    The denial of MC Dallas' claim for services rendered to Patient 22 constituted a wrongful denial of benefits and should be reversed.

399.    First, MC Dallas timely notified Highmark PA of Patient 22's admission and requested authorization. Highmark PA denied the authorization request on the basis that the services were not covered. Subsequently, however, Highmark PA did retroactively authorize the services. Ultimately, Highmark PA's decision to delay issuing authorization of services for more than 72 hours after Patient 22's admission is not a valid reason to deny payment of a claim that was, in fact, authorized. Further, Highmark PA is prohibited by Texas law from denying payment for MC Dallas' medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the North Texas Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

400.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Dallas' request for

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 97**

the same. Further, the services rendered were medically necessary as evidenced by Patient 22's medical records.

401.     Third, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

402.     In sum, MC Dallas provided medically necessary, covered services to Patient 22 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Dallas is entitled to be paid $28,410.00 for the medically necessary, covered services it provided to Patient 22.

403.     <u>Patient 23, Admitted and Discharged in 2023:</u> At the time services were rendered, Patient 23 was a 58-year-old female with a history of morbid obesity, hypertension, constipation, and pulmonary embolism on anticoagulation. Patient 23 was diagnosed with tricompartmental and unilateral primary osteoarthritis of the right knee. She presented to MC Las Colinas for an elective right total knee arthroplasty with a planned short admission post-operatively for observation.

404.     The total knee replacement was completed without any complication, and Patient 23 remained in the hospital post-operatively for observation. She was given hydromorphone every three hours as needed for pain. Despite the medication, her pain worsened over the course of the day and into post-operative day one. At which time, Patient 23 was admitted as an inpatient per physician order due to her uncontrolled postoperative pain. When Patient 23's pain was controlled on post-operative day two, she was discharged.

405.     Patient 23 presented to MC Las Colinas with coverage under a Highmark PA health plan. On April 23, 2023, MC Las Colinas timely sent notice of Patient 23's admission and clinicals to Highmark PA.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                      **Page 98**

406.    On April 25, 2023, MC Las Colinas spoke with a Highmark PA representative who stated the authorization request was pending and would take two to three business days. An hour later, however, a Highmark PA representative called back to inform MC Las Colinas that authorization for the services was denied due to a purported lack of medical necessity.

407.    On or about May 3, 2023, MC Las Colinas timely submitted two separate claims[17] for reimbursement for the medically necessary services provided to Patient 23. Via remittance dated May 9, 2023, MC Las Colinas was informed that Highmark PA denied the claim for inpatient services on the basis that the services rendered were purportedly not medically necessary.

408.    On May 11, 2023, MC Las Colinas timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 23's medical records, and requested a medical necessity review. On June 2, 2023, MC Las Colinas spoke with a BCBSTX representative who confirmed the appeal was received on May 22, 2023 and requested 30-60 days to complete review. Via correspondence dated June 15, 2023, MC Las Colinas was informed that Highmark PA upheld the denial based on a purported lack of medical necessity.

409.    On June 26, 2023, MC Las Colinas timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 23's medical records, and again requested a medical necessity review. Between July 17, 2023 and October 4, 2023, MC Las Colinas called BCBSTX no fewer than 11 times regarding the status of the appeal and each time, BCBSTX representatives stated that additional time was needed.

410.    On October 11, 2023, MC Las Colinas spoke with a BCBSTX representative who stated the appeal was forwarded to Highmark PA on September 27, 2023, and on October 5, 2023,

---

[17] MC Las Colinas submitted two separate claims, one for the outpatient services, and the other for the inpatient services.  The claim for outpatient services was paid in full by Highmark PA on May 10, 2023.

Highmark PA upheld the denial of the claim on the basis that the services were purportedly not medically necessary. Via correspondence dated October 20, 2023, MC Las Colinas was informed that Highmark PA upheld the denial due to a lack of complication during Patient 23's "elective surgery."

411.    Via correspondence dated November 8, 2023, BCBSTX, on behalf of Highmark PA, stated that the claim denial was based on the member's benefit coverage and to contact Highmark PA if MC Las Colinas disagreed with the decision.

412.    The denial of MC Las Colinas' claim for services rendered to Patient 23 for an alleged lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

413.    First, MC Las Colinas timely notified Highmark PA of Patient 23's admission and requested authorization, but Highmark PA denied the authorization request because the services were purportedly not medically necessary. However, as established by Patient 23's medical records, Patient 23 was not clinically stable for discharge following her post-operative observation and required admission because she continued to have uncontrolled pain that required intensive management. The fact that InterQual criteria was met corroborates the medical necessity of the inpatient admission that was ordered by Patient 23's physician in the exercise of their professional medical judgment.

414.    Second, the denial is improper because Highmark PA never provided a sufficient clinical basis for the denial. This violates Texas law. *See* Tex. Ins. Code § 4201.303(a)(1)-(3).

415.    In sum, MC Las Colinas rendered medically necessary, covered services to Patient 23 and is entitled to payment in full for those services. In accordance with the terms of the North Texas Agreement, MC Las Colinas is entitled to be paid $47,692.35 for the medically necessary, covered services it provided to Patient 23.

416.    <u>Patient 24, Admitted and Discharged in 2023:</u> At the time the services were rendered, Patient 24 was a 54-year-old female who presented to MC Denton's orthopedic clinic. Previously, she had been recommended for left hip replacement and continued to struggle with hip, groin, and thigh pain. Almost two years before she had cephalomeullary nail surgery and had since been unable to walk without a walker. Her pain was reportedly exacerbated by weightbearing and walking. Upon examination, her left leg appeared shorter than her right and there was pain with passive range of motion in her hip. Imaging showed the subtrochanteric portion of her femur fracture was healed, however, the intertrochanteric region did not have complete bony consolidation. The orthopedic clinic discussed treatment options, which included revision open reduction internal fixation surgery versus total hip replacement. Patient 24 already had arthritic changes of the femoral acetabular joint; accordingly, total hip replacement was likely the best option with a more predictable outcome, and Patient 24 agreed. Patient 24, however, had diabetes and a history of smoking, which put her at a significantly higher risk of infection. Patient 24 was encouraged to abstain from smoking to reduce her risk of infection.

417.    Nearly two weeks after her orthopedic surgery appointment, Patient 24 underwent removal of cephalomedullary nail and a left total hip arthroplasty at MC Denton. Intraoperatively, Patient 24 developed new-onset paroxysmal atrial fibrillation and then post-operatively, she became fatigued and somnolent, with difficulty speaking. As such, she was admitted as an inpatient per physician order for treatment of her post-operative complications.

418.    On post-operative day one, cardiology was consulted, and an echocardiogram was ordered for further evaluation of paroxysmal atrial fibrillation. However, Patient 24 had remained in normal sinus rhythm since the development of atrial fibrillation intraoperatively. Acute encephalopathy was noted to be resolved on this day. Overall, Patient 24's condition had improved,

but she did require additional work-up and continued monitoring to ensure stability prior to discharge.

419.    Then, on post-operative day two, Patient 24 was noted to have acute blood loss anemia from recent hip surgery with hemoglobin of 7.4 and hematocrit of 22.3. She received a blood transfusion and was initiated on iron. Additionally, she worked with physical therapy/occupational therapy due to new functional impairments.

420.    On post-operative day four, MC Denton's case management noted that the plan was to pursue inpatient rehabilitation programs. Patient 24 was clinically accepted to an inpatient rehabilitation program, however, Highmark PA denied authorization for inpatient rehabilitation on post-operative day six.

421.    On post-operative day 10, Patient 24 was clinically accepted to a skilled nursing facility pending authorization by Highmark PA. On post-operative day 17, Highmark PA approved the authorization request for discharge to skilled nursing facility, and Patient 24 was discharged the same day.

422.    Via correspondence on May 5, 2023, MC Denton was notified that Highmark PA denied authorization for Patient 24's inpatient admission purportedly due to an untimely notification and that peer to peer review was not available.

423.    On May 5, 2023, MC Denton timely submitted its claim for reimbursement for the services rendered to Patient 24 to BCBSTX for forwarding to Highmark PA. Via remittance on May 12, 2023, MC Denton was notified that Highmark PA had denied its claim based on a purported lack of medically necessary.

424.    On May 15, 2023, MC Denton submitted its appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 24's medical records, and requested a medical necessity

review. Via correspondence dated June 17, 2023, MC Denton was notified that Highmark PA upheld its denial on the basis that the services rendered were purportedly not medically necessary.

425.    The denial of MC Denton's claim for services rendered to Patient 24 due to lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

426.    First, the medical records for Patient 24 establish the medical necessity of the left total hip arthroplasty procedure and inpatient admission. Patient 24 was ultimately admitted due to severe complications following her procedure. MC Denton worked diligently to obtain placement and authorization for a discharge to a lower setting of acuity. As a result of Highmark PA's actions, Patient 24 was not discharged until post-operative day 17.

427.    In sum, MC Denton rendered medically necessary, covered services rendered to Patient 24 and is entitled to payment in full for those services. In accordance with the terms of the North Texas Agreement, MC Denton is entitled to be paid $97,101.12 for the medically necessary, covered services provided to Patient 24.

428.    Patient 25, Admitted and Discharged in 2021: At the time the services were rendered, Patient 25 was a 61-year-old male with a prior history of hypertension, diabetes mellitus, and diet-controlled hyperlipidemia who presented to Conroe for a scheduled heart catheterization. Patient 25 was admitted post-operatively due to findings of significant triple vessel coronary artery disease and underwent triple bypass surgery with a temporary pacemaker placed two days after he originally presented to Conroe. Patient 25 required significant pacing while admitted to Conroe's post-anesthesia care unit and placement of a permanent pacemaker eight days into his admission. Patient 25 was discharged from Conroe the day after the permanent pacemaker was placed.

429.    Patient 25 presented to Conroe with coverage under a Highmark PA health plan. On March 23, 2021, Conroe timely notified Highmark PA of Patient 25's admission and provided

his clinicals. Highmark PA did respond to this request. On April 1, 2021, Conroe spoke with a Highmark PA representative who stated that there was no case on file for Patient 25 and that Conroe would need to request retroactive authorization.

430.    On April 4, 2021, Conroe timely submitted its claim for the services rendered to Patient 25 to BCBSTX for forwarding to Highmark PA. On May 3, 2021, Conroe spoke to a BCBSTX representative who stated that Highmark PA had denied the claim based on a purported lack of authorization and that Patient 25 was responsible for the balance.

431.    On May 20, 2021, Conroe timely submitted its first-level appeal, enclosed a copy of Patient 25's medical records, and requested a medical necessity review.

432.    Via correspondence dated June 3, 2021, Highmark PA approved Conroe's request for retroactive authorization for Patient 25's inpatient admission under Authorization #1768313.

433.    On June 9, 2021, Conroe spoke to a BCBSTX representative who stated the claim was not eligible for adjustment and that a 100% sanction had been applied purportedly because authorization was not timely obtained.

434.    On June 21, 2021, Conroe spoke with a BCBSTX representative who stated the appeal was forwarded back to Highmark PA as a second-level verbal appeal. On July 16, 2021, Conroe spoke with a BCBSTX representative who stated that Highmark PA had again upheld the denial on the basis that the authorization was not timely received.

435.    The denial of Conroe's claim for services rendered to Patient 25 based an alleged lack of or untimely authorization constituted a wrongful denial of benefits and should be reversed.

436.    First, Conroe timely provided notification of Patient 25's inpatient admission and requested authorization of the same. Highmark PA did not respond to or act upon this request until it retroactively authorized the services approximately three months later. Highmark PA cannot

maintain its denial based on either a lack of or untimely authorization when it refused to respond to a timely request for authorization. Further, Highmark PA actually authorized the services in question. As such, Highmark PA is prohibited by Texas law from denying payment for Conroe's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

437.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Conroe's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 25's medical records.

438.    Finally, Highmark PA has suffered no prejudice due to any alleged lack of authorization because Conroe rendered medically necessary care to Patient 25, and Highmark PA has not challenged the appropriateness of care and, in fact, retroactively authorized the care provided.

439.    In sum, Conroe provided medically necessary, covered services to Patient 25 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Conroe is entitled to be paid $71,094.19 for the medically necessary, covered services it provided to Patient 25.

440.    <u>Patient 26, Admitted and Discharged in 2021</u>: At the time the services were rendered, Patient 26 was a 55-year-old male who presented to MC Denton's emergency department for concerns of a stroke after urinating on himself and experiencing left-sided deficits. In MC Denton's emergency department, a CT angiography of Patient 26's head revealed a large

vessel occlusion of the right M1 vertebral artery. Neuro-interventional radiology was consulted, and Patient 26 was admitted as an inpatient per physician order for vascular intervention. Patient 26 underwent a mechanical thrombectomy of the right, middle cerebral artery and was immediately transferred to MC Denton's ICU while intubated. Several days later, a repeat head scan revealed a right, middle cerebral artery distribution infarct with new effacement of regional sulci and compression of the right frontal horn secondary to edema. While receiving treatment, Patient 26 also participated in intensive physical and occupational therapy. After 11 days of inpatient admission, Patient 26 was discharged to an inpatient rehabilitation facility in stable condition.

441.    Patient 26 initially presented to MC Denton as uninsured. It was not until May 3, 2021, after Patient 26's discharge, that MC Denton was able to confirm that Patient 26 had coverage under a Highmark PA health plan.

442.    On May 8, 2021, MC Denton timely submitted its claim for the services rendered to Patient 26 to BCBSTX for forwarding to Highmark PA.

443.    Via remittance dated May 19, 2021, MC Denton was informed that Highmark PA had denied the claim based on a purported lack of authorization/notification.

444.    On May 25, 2021, MC Denton timely submitted its first-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 26's medical records, and requested a medical necessity review.

445.    On June 29, 2021, MC Denton spoke to a representative of Highmark PA who requested that the first-level appeal be resubmitted as a request for reconsideration and retroactive authorization, which MC Denton did on July 1, 2021.

446.    Via correspondence dated August 23, 2021, MC Denton was notified that Highmark PA had approved its request for retroactive authorization.  Highmark PA, however, ultimately upheld its denial on the basis that authorization was not timely received, and therefore, a 100% provider sanction was applied.

447.    The denial of MC Denton's claim for services rendered to Patient 26 based on either an alleged lack of or untimely authorization constituted a wrongful denial and should be reversed.

448.    First, Highmark PA did retroactively authorize Patient 26's inpatient admission. As such, Highmark PA is prohibited by Texas law from denying payment for MC Denton's medically necessary services under these circumstances. *See* Tex. Ins. Code Section 1301.135(f). Further, under the terms of the North Texas Agreement, authorized services must be paid unless there is a finding of material misrepresentation or the hospital failed to perform the services, neither of which is applicable here.

449.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the North Texas Agreement, despite MC Denton's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 26's medical records and Highmark PA's retroactive authorization.

450.    Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

451.    Third, Highmark PA has suffered no prejudice due to any alleged lack of authorization because MC Denton rendered medically necessary care to Highmark PA's member, and Highmark PA has not challenged the appropriateness of care and, in fact, retroactively authorized the care provided.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                          **Page 107**

452.    In sum, MC Denton provided medically necessary, covered services to Patient 26 and is entitled to payment in full for those services. According to the terms of the North Texas Agreement, MC Denton is entitled to be paid $80,190.00 for the medically necessary, covered services it provided to Patient 26.

453.    Patient 27, Admitted and Discharged in 2021: At the time services were rendered, Patient 27 was a 65-year-old male with a history of hypertension, hyperlipidemia, diabetes mellitus, and coronary artery disease who presented to Georgetown MC's emergency department with worsening shortness of breath, cough, pleuritic chest pain, and hypoxia. Patient 27 had recently been diagnosed with COVID-19 and received therapeutic treatment for his symptoms.

454.    Upon arrival at Georgetown MC, Patient 27 had low oxygen saturation levels requiring placement of non-rebreather until he was weaned to a nasal cannula. He was then admitted as an inpatient for further treatment per physician order. He required transition to high flow nasal cannula due to decreasing oxygen saturation levels, as well as frequent respiratory therapy treatments. Patient 27 remained on high flow nasal cannula until his supplemental oxygen was decreased after approximately 15 days in the hospital. Once medically stable, Patient 27 was subsequently discharged home with home oxygen.

455.    Initially, Patient 27 presented to Georgetown MC with Aetna coverage. Then, on August 16, 2021, Georgetown MC learned that Patient 27 had coverage under a Highmark PA health plan. Georgetown MC faxed clinicals and a notification of admission to Highmark PA the same day. On August 18, 2021, Georgetown MC spoke with a Highmark PA representative who stated that the claim required a retroactive authorization review because Highmark PA did not receive notice of admission within seven days of admission. On August 20, 2021, Georgetown MC spoke with a Highmark PA representative who advised that a retroactive authorization request

needed to be mailed to Highmark PA's medical review department.

456. On August 24, 2021, Georgetown MC timely submitted its claim for reimbursement for the services provided to Patient 27 to BCBSTX for forwarding to Highmark PA. Via remittance dated September 2, 2021, Georgetown MC was informed that Highmark PA denied the claim for a purported lack of precertification/authorization/notification.

457. On, September 7, 2021, Georgetown MC timely submitted its first-level appeal to BCBSTX for forwarding to Highmark, enclosed a copy of Patient 27's medical records, and requested a medical necessity review. Between September 28 and October 12, 2021, Georgetown MC spoke with BCBSTX representatives at least two times and was informed both times that the reconsideration remained under review. On October 20, 2021, Georgetown MC spoke with a BCBSTX representative who stated that Highmark PA upheld its denial of the claim due to a purported lack of authorization.

458. On November 8, 2021, Georgetown MC timely submitted its second-level appeal to BCBSTX for forwarding to Highmark PA, enclosed a copy of Patient 27's medical records, and again requested a medical necessity review. The second-level appeal also requested retroactive authorization. On November 29, 2021, Georgetown MC spoke to a BCBSTX representative who stated that Highmark PA had upheld the denial on November 21, 2021 due to a purported lack of authorization.

459. The denial of Georgetown MC's claim for services rendered to Patient 27 as not authorized constituted a wrongful denial of benefits and should be reversed.

460. First, Patient 27 initially presented with Aetna as his primary insurer, and Georgetown MC did not discover Patient 27's Highmark PA coverage until after his discharge. Georgetown MC notified Highmark PA of the admission and requested authorization the day it

was informed of Patient 27's Highmark PA coverage.

461.    Second, there is no indication that Highmark PA performed a medical necessity review on appeal, as provided for in the St. David's Agreement, despite Georgetown MC's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 27's medical records.

462.    Further, at least some portion of the billed services constituted emergency and post-stabilization care services for which Highmark PA is required to pay under state and federal law. *See* 42 CFR § 438.114 and Tex. Ins. Code §1301.155.

463.    Finally, Highmark PA suffered no prejudice because of any alleged lack of authorization. Georgetown MC rendered medically necessary care to Patient 27, and Highmark PA has never challenged the appropriateness of that care.

464.    In sum, Georgetown MC provided medically necessary, covered services to Patient 27 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, Georgetown MC is entitled to be paid $27,571.18 for the medically necessary, covered services it provided to Patient 27.

### D.    CAUSES OF ACTION

### COUNT I- BREACH OF CONTRACT (AGREEMENTS)

465.    The foregoing paragraphs are incorporated by reference.

466.    As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat Subscribers with BCBS health plans and be reimbursed for that treatment.

467.    Upon information and belief, the BlueCard program operates by all individual state licensees of the Blue Cross Blue Shield Association entering into contracts with the Blue Cross

Blue Shield Association that allow licensees, such as the Defendants, nation-wide access to in-network reimbursement rates of affiliated BCBS health plans, such as BCBSTX, for their members who receive medical services while living or traveling outside of the geographic boundaries of the "Home Plan" that issues the policy. In effect, these nation-wide contracts provide a means by which individual licensees of the Blue Cross Blue Shield Association, such as BCBSTX, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the Blue Cross Blue Shield Association, such as Defendants, thus allowing those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts.

468.    The assigning Blue Cross Blue Shield Association licensee – in this case, BCBSTX – then acts as an agent for the Home Plan in administering the claims, which are in turn forwarded to the Home Plan – in this case, Defendants – for final determination and payment.

469.    Defendants are affiliates of BCBSTX, as defined in the Agreements. Part III(H) of the Agreements specifically allows affiliates of BCBSTX access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the affiliates comply with all terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to Subscribers of affiliates, which includes Defendants, as set forth in and subject to the terms and conditions of the Agreements.

470.    Defendants, by their conduct in processing the claims, communicating with Plaintiffs regarding such claims, and making partial payment on some of the claims based on the contractual reimbursement rates provided for in the Agreements, did in fact access and rely upon the Agreements. As an affiliate of BCBSTX, who has accessed and relied upon the Agreements,

and acted as an assignee of the Agreements, Defendants are bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

471.     Defendants' intent to be bound by the terms of the Agreements is also demonstrated by the representations made by Defendants to their Subscribers and to providers. Specifically, upon information and belief, Defendants represent that Plaintiffs are "in-network" with Defendants through the BlueCard Program.[18]  Further, upon information and belief, Defendants have made representations to their Subscribers on their website and in informational and marketing materials concerning the BlueCard Program and its purported nationwide coverage.[19] Defendants also represent in their Provider Manual that the Home Plan is responsible for adjudicating claims for services provided to Subscribers based on the Subscribers' benefits and the providers' agreement with the local BCBS plan.[20]

472.     Accordingly, there was a meeting of the minds between Plaintiffs and Defendants as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

473.     Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a Subscriber.

474.     Plaintiffs provided medically necessary, covered services to each of the 27 Subscribers whose hospital admissions are at issue, and those services are payable under the terms of the Agreements.

---

[18]*See* Exhibits 1-3.

[19] *See* Exhibits 1-4.

[20] *See* Exhibit 5.

475.    Defendants breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.[21]

476.    Plaintiffs suffered damages as a direct and proximate result of Defendants' breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $2,831,508.76 under the Agreements for the medically necessary, covered services that Plaintiffs provided to Defendants' Subscribers.

### COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT

477.    The foregoing paragraphs are incorporated by reference.

478.    Alternatively, if Defendants are not bound by the terms of the Agreements as affiliates of BCBSTX, Plaintiffs are entitled to be reimbursed for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and Defendants by reason of Defendants' participation in the BlueCard Program.

479.    As participants in the BlueCard Program, Plaintiffs and Defendants impliedly agreed and understood that: (1) Plaintiffs would provide services to Defendants' Subscribers, (2) Plaintiffs would submit claims to BCBSTX for forwarding to Defendants for services provided to the Subscribers, and (3) Defendants would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with BCBSTX.

480.    By participating in the BlueCard Program, Defendants—as affiliates of BCBSTX—were obligated to reimburse Plaintiffs at the rates set forth in the Agreements, even if Defendants were not signatories to the Agreements.

481.    Defendants' intent to be bound by an implied-in-fact contract with Plaintiffs is also

---

[21] Patient 19 is the only patient Subscriber of Defendant Highmark NY. All other patients are Subscribers of Highmark PA. As such, all references to breaches throughout this Complaint by Highmark NY will only refer to Patient 19.

evidenced by Defendants' conduct.  Defendants participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, issued authorizations, reviewed and adjudicated appeals, and made partial payment on some of the claims (as described in detail above) at the rates set forth in the Agreements.

482.    Defendants' intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by Defendants to their Subscribers and to providers. Specifically, upon information and belief, Defendants represent that Plaintiffs are "in-network" with Defendants through the BlueCard Program.[22]   Further, upon information and belief, Defendants have made representations to their Subscribers on their website and in informational and marketing materials concerning the BlueCard Program and its purported nationwide coverage.[23] Defendants also represent in their Provider Manual that the Home Plan is responsible for adjudicating Subscriber claims based on the Subscriber's benefits and the provider's arrangement with the local BCBS plan.[24]

483.    Accordingly, there was a meeting of the minds between Plaintiffs and Defendants as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

484.    Plaintiffs and Defendants understood Defendants to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of their participation in the BlueCard Program and by Defendants' own conduct and representations.

485.    In reliance on the implied-in-fact contract formed between Plaintiffs and Defendants by reason of their participation in the BlueCard Program, Plaintiffs provided medical

---

[22] *See* Exhibits 1-3.

[23] *See* Exhibits 1-4.

[24] *See* Exhibit 5.

services to Defendants' Subscribers with the expectation that Defendants would reimburse Plaintiffs for such services according to the terms of the Agreements.

486.    By denying claims for services provided by Plaintiffs to Defendants' Subscribers, Defendants have breached the implied-in-fact contract existing between Plaintiffs and Defendants.

487.    Plaintiffs have suffered damages as a direct and proximate result of Defendants' breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $2,831,508.76 for the medically necessary, covered services Plaintiffs provided to Defendants' Subscribers.

**COUNT III – FAILURE TO COMPLY WITH HEALTH BENEFIT PLAN IN VIOLATION OF ERISA**

488.    The foregoing paragraphs are incorporated by reference.

489.    As explained above, Plaintiffs provided medically necessary, covered services to the 27 Subscribers described above, all of whom are Defendants' Subscribers. Plaintiffs are therefore entitled to be paid the amounts due under the Agreements for that care.

490.    The Agreements apply to Plaintiffs' treatment of Defendants' Subscribers. Plaintiffs are also entitled to payment under the terms of each Subscriber's health plan because each of the inpatient admissions was a medically necessary service that is covered by each Subscriber's health plan.

491.    Upon information and belief, some or all of the 27 Subscribers whose hospital admissions are at issue are Subscribers to an employer-sponsored health insurance policy that Defendants administer or underwrite. Thus, ERISA governs those health plans.

492.    Plaintiffs are entitled to enforce the terms of the Subscribers' health plans as the Subscribers' assignee under 29 U.S.C. § 1132(a)(1)(B). Upon admission to Plaintiffs' hospitals, each patient or their legal representative signs a form, often referred to as Conditions of Admission,

that includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits in litigation or in any other forms of dispute resolution in any forum for any type of relief) to Plaintiffs. The Subscribers at issue in this matter (or their legal representative) signed this Conditions of Admission form assigning their rights and benefits under their health plan to the Plaintiffs. Further, Plaintiffs' claims for reimbursement each indicated on field 53 of the claim form (UB-04) that they were being submitted pursuant to an assignment of benefits. These Conditions of Admission each contain the following provision or substantially similar language: "[p]atient assigns all his/her rights and benefits under existing polices of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider… I hereby irrevocably appoint the Provider as my authorized representative to pursue any claims…. and/or legal remedies."

493.    When Plaintiffs appealed each of the wrongful denial of benefits described above, they requested copies of the relevant health plan documents along with a statement of the plan's review procedures and time limits applicable to such review procedures, including any contractual limitations periods and any plan provisions or guidelines that Defendants were relying upon for their denial. Defendants did not provide the requested health plan documents, plan provisions, guidelines, or otherwise advise Plaintiffs of contractual limitations periods, limitations on the assignability of benefits, or other relevant procedures from the health plan documents at any point during the claim adjudication and appeals process.

494.    As explained above, Plaintiffs provided medically necessary, covered services to each of the 27 Subscribers at issue. On information and belief, those services qualify as covered services under the Subscribers' health plans, and Defendants are therefore obligated to pay Plaintiffs for those services.

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    **Page 116**

495.    As explained above, Defendants failed to pay Plaintiffs for the covered services that they provided to these 27 Subscribers. Defendant's wrongful denial of benefits for the medically necessary inpatient hospital services that Plaintiffs provided to these Subscribers breached the terms of each Subscriber's health plan, which Plaintiffs have standing to sue under through the Subscribers' assignments of benefits and rights via the Conditions of Admission that they (or their legal representative) executed upon admission to Plaintiffs' hospitals.

496.    As a proximate result of Defendants' breach of these Subscribers' health plans, Plaintiffs have been damaged in an amount in excess of the jurisdictional requirements of this Court. Plaintiffs are entitled to recover payment in an amount not less than $2,831,508.76 for the medically necessary, covered services Plaintiffs provided to the Defendants' Subscribers.

### COUNT IV – BREACH OF CONTRACT (FOR HEALTH PLANS NOT SUBJECT TO ERISA)

497.    The foregoing paragraphs are incorporated by reference.

498.    Alternatively, Plaintiffs provided medically necessary, covered services to each of the Subscribers whose hospital admissions are at issue, and those services are covered under the terms of each Subscriber's respective health plan. To the extent that any of those health plans are not subject to ERISA, Plaintiffs are entitled to recover payment under each Subscriber's health plan under a common law claim for breach of the health plan contract.

499.    Each health plan is a contract between the Subscriber and respective Defendant under which the Defendant agrees to cover medically necessary, covered services that the Subscriber receives. Plaintiffs have standing to sue for breach of contract for Defendants' failure to pay for these Subscribers' hospital admissions because each Subscriber assigned their benefits and their rights to pursue benefits under their health plan to Plaintiffs.

500.    Plaintiffs performed their obligations under the Subscribers' health plans by

providing medically necessary, covered services to each Subscriber.

501.    Defendants breached the Subscribers' health plans by failing to issue payment to Plaintiffs at the rates set forth in the Agreements for the medically necessary, covered services that Plaintiffs provided.

502.    Plaintiffs suffered damages due to Defendants' breach of each Subscriber's health plan; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $2,831,508.76 under the Agreements for the medically necessary, covered services that Plaintiffs provided to the Defendants' Subscribers.

### COUNT V – PROMISSORY ESTOPPEL

503.    The foregoing paragraphs are incorporated by reference.

504.    As stated above, with respect to multiple claims at issue in this dispute, Defendants authorized the services rendered by Plaintiffs to Defendants' Subscribers.

505.    Plaintiffs reasonably relied upon Defendants' authorizations as promises to pay the rates set forth in the Agreements for the services provided to their Subscribers and continued to provide such services to Defendants' Subscribers.

506.    Defendants knew or reasonably should have known that Plaintiffs would rely on their promises to pay the rates set forth in the Agreements for the services provided to its health plan members as Plaintiffs provided the authorized services to Defendants' Subscribers.

507.    Injustice to Plaintiffs can be avoided only if Defendants' promise to pay the rates set forth in the Agreements for the services Plaintiffs provided to Defendants' Subscribers with respect to the claims that they authorized is enforced.

508.    Plaintiff's reliance on Defendants' promise to pay the rates set forth in the Agreements for the services Plaintiffs provided to Defendants' Subscribers with respect to the

claims that they authorized resulted in Plaintiffs suffering monetary damages within the jurisdictional limits of this Court. Accordingly, there is now due, owing, and unpaid from Defendants to Plaintiffs an amount to be proven at trial for the services provided by Plaintiffs to Defendants' Subscribers that were authorized by Defendants.

## CONDITIONS PRECEDENT

509. All conditions precedent have been performed or have occurred.

## ATTORNEYS' FEES

510. The foregoing paragraphs are incorporated by reference.

511. Plaintiffs are entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g) and Tex. Civ. Prac. & Rem. Code §§ 38.001.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Columbia Medical Center of Plano Subsidiary, L.P. d/b/a Medical City Plano and d/b/a Medical City Frisco, a Medical Center of Plano Facility; Columbia Hospital at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas; Columbia North Hills Hospital Subsidiary, L.P. d/b/a Medical City North Hills; Columbia Medical Center of Las Colinas, Inc. d/b/a Medical City Las Colinas; Columbia Medical Center of Denton Subsidiary, L.P. d/b/a Medical City Denton; El Paso Healthcare System, Ltd. d/b/a Las Palmas Medical Center and d/b/a Del Sol Medical Center; St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Medical Center, d/b/a St. David's North Austin Medical Center, d/b/a St. David's South Austin Medical Center, d/b/a St. David's Georgetown Hospital, and d/b/a Heart Hospital of Austin; KPH-

Consolidation, Inc. d/b/a HCA Houston Healthcare Kingwood; CHCA Conroe, L.P. d/b/a HCA

Houston Healthcare Conroe; Orthopedic Hospital, Ltd. d/b/a Texas Orthopedic Hospital; Bay Area

Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center; Columbia Rio Grande Healthcare,

L.P. d/b/a Rio Grande Regional Hospital hereby request that Defendants Highmark Inc. d/b/a

Highmark Blue Cross Blue Shield; and Highmark Western and Northeastern New York Inc. d/b/a

BlueCross BlueShield of Western New York and BlueShield of Northeastern New York be cited

to appear and answer this Original Complaint, and that upon final trial and determination thereof,

that judgment be entered in favor of the Plaintiffs awarding them the following relief:

A.  The amount due under the Agreements;

B.  Reasonable attorneys' fees and court costs; and

C.  Such other and further relief to which Plaintiffs may be entitled.

Dated this the 5th day of March 2025.

Respectfully submitted,

POLSINELLI PC

*/s/ Adam D. Chilton*
Adam D. Chilton
TX State Bar No. 24092255
POLSINELLI PC
2950 N. Harwood, Suite 2100
Dallas, Texas 75201
Telephone: (214) 661-5515
Facsimile: (214) 279-2335
adam.chilton@polsinelli.com
**COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiffs hereby certifies that the foregoing document was e-Filed with the Court on March 5, 2025.


*/s/ Adam D. Chilton*
Adam D. Chilton